*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 13-CV-920 & 13-CV-921

PROVIDENCE HOSPITAL, INC., APPELLANT/CROSS APPELLEE,

v.

JOHN WILLIS, APPELLEE/CROSS-APPELLANT.

Appeals from the Superior Court of the
District of Columbia
(CAM-8643-11)

(Hon. Neal E. Kravitz, Trial Judge)

(Argued October 23, 2014                    Decided November 20, 2014)

*Donald L. DeVries*, *Jr.*, with whom *Craig S. Brodsky* and *Erin Christen Miller* were on the brief, for appellant/cross-appellee. *Janet A. Forero* also entered an appearance for appellant/cross-appellee.

*Sandra H. Robinson*, with whom *Jack H. Olender* was on the brief, for appellee/cross appellant.

*D. Lee Rutland* filed a Statement in lieu of a brief for defendant William Brownlee, III, M.D.

Before BLACKBURNE-RIGSBY and EASTERLY, *Associate Judges*, and FARRELL, *Senior Judge*.

PER CURIAM: A jury awarded plaintiff/cross-appellant John Willis $650,000

in damages for an injury arising from negligence by nurses employed by

defendant/appellant Providence Hospital (the Hospital) when, after a surgery, they failed to place on his legs sequential compression devices (SCDs) ordered by the surgeon. The Hospital moved to set aside the verdict, arguing that Willis had not proven a causal link between the negligence and his injuries, ultimately the below-knee amputation of both of his legs at another hospital. Willis, in turn, moved for a new trial on damages asserting that the jury's award was inadequate under the circumstances and was likely influenced by the trial court's refusal to give an instruction on "special susceptibility."

The trial judge denied both motions, leading to this appeal and cross-appeal in which the parties renew their objections to the verdict. We affirm the judgment essentially for the reasons stated by Judge Kravitz in his comprehensive, painstaking opinion, which we append hereto. The following discussion, which assumes familiarity with the judge's analysis, supplements it in two respects.

1. As the trial judge explained, the principal dispute between Willis and the Hospital at trial[1] was whether deep venous thrombosis (DVT) became "well-

---

[1] The surgeon who operated on Willis, Dr. William Brownlee, III, was also named as a defendant, but the jury found no negligence on his part and Willis does
(continued…)

established" in Willis's legs before, or instead after, a second surgery performed to ameliorate an abscess on his right buttock. If the latter was the case, then expert testimony supported the jury's finding that negligence by nurses in not placing SCDs on Willis's legs after the second surgery, despite instructions from the surgeon to do so, contributed causally to the below-knee amputation of his legs ten days later at Prince George's Hospital Center. The trial judge, applying the correct test of causation,[2] arrayed the pertinent evidence and concluded that the jury, "without engaging in impermissible speculation," had reasonably found that "the plaintiff's DVT did not become well-established until after the second surgery, and that the application of SCDs beginning on [the date of that surgery,] September 10, 2008, would have prevented the formation of a well-established DVT . . . ."

On appeal, the Hospital disputes this conclusion but does so, in our view, chiefly by overstating the plaintiff's burden of proof. It contends that the judge

_____

 (…continued)
not contest that decision on appeal.

[2] To establish proximate cause, "the expert need only state an opinion, based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of the plaintiff's injuries." *Travers v. District of Columbia*, 672 A.2d 566, 573 (D.C. 1996); *see also Perkins v. Hansen*, 79 A.3d 342, 344 (D.C. 2013).

wrongly "shifted the burden of proof on the issue of causation" to the defense (Br. for Appellant at 16) by not recognizing that "[i]t was incumbent on Mr. Willis to prove that the DVT had *not yet* become 'well-established' by September 10th when [the surgeon] entered the order for SCDs" (*id.* at 6; italics added). *See id.* at 14 ("[N]one of the [plaintiff's] experts could establish with reasonable medical probability that the DVT had *not* already formed before the order for SCDs was placed" (italics added)). The Hospital thus argues that Willis had to prove a negative: It was not enough for him to show that the DVT more likely than not became well-established in the ten days after the negligence; he also had to disprove – to rule out – that it did so in the five-day interval between the two surgeries. But while the Hospital cites unassailable legal principles such as that a medical expert's opinion must be formed "with sufficient certainty so as to make a medical judgment," *Lasley v. Georgetown Univ.*, 688 A.2d 1381, 1388 (D.C. 1997), and that more than a temporal relationship – "contemporaneity" – between a medical procedure and an injury must have existed to prove causation, *Derzavis v. Bepko*, 766 A.2d 514, 522 (D.C. 2000), it points to no case law or other authority requiring Willis to negate a possibility (*i.e.*, that the DVT became established too early for the ordered prophylaxis to be effective) *and* show by a preponderance of the evidence, as he did, that timely placement of the SCDs would have kept the

DVT from becoming well-established.[3]  Requiring Willis to do both, in our judgment, would amount to increasing his burden of proof to something akin to the standard in criminal cases.  *Cf. Chapman v. California*, 386 U.S. 18, 24 (1967) (in criminal case, disproving prejudice "beyond a reasonable doubt" from constitutional error tantamount to dispelling any "reasonable possibility" of such prejudice).

Altogether, then, we agree with Judge Kravitz that, while "[t]his was a very close case on the issue of causation," Dr. Hall (Willis's chief medical expert) "never withdrew or even backed away from his opinion that the nurses' negligence proximately caused the plaintiff's amputations, and the evidence, although hotly contested, was sufficient to support his opinion."[4]  Willis, required only to meet the

---

[3]  To state the point in the language of *Travers*, *supra* note 2, the Hospital cites no authority holding that Willis's burden to show that negligence "more likely than anything else" contributed to his injury demanded that he rule out the "anything else."

[4]  The Hospital asserts that the following testimony by Dr. Hall undermined his opinion on causation:

> Q.  [on cross-examination:]  So we can agree that it's not likely that SCDs would have retarded the growth of the clot once it had started.  Is that correct?

(continued…)

standard of causation stated in *Travers, supra* note 2, met his burden of proof.

2.  Willis's argument, as cross-appellant, that the jury's award of $650,000 in damages was inadequate requires discussion mainly of his claim that the judge's refusal to give the "special susceptibility" instruction was error[5] and may have

_____

(…continued)

> A.  Well, I don't know about once it had started, but if it was a well-established deep venous thrombosis, then I think most people believe that SCDs have not much of a role from that point forward.

From this the Hospital argues that Dr. Hall held no opinion whether SCDs could be effective once the DVT process had even "started." But that reading ignores Hall's testimony as a whole (as summarized by Judge Kravitz), which may be why the Hospital's counsel asked no follow-up question of Hall to remove any ambiguity on the point.

[5]  Instruction 13.08, Standard Civil Jury Instructions for the District of Columbia (2014 ed. rev.), states:

> If the plaintiff, because of a prior injury, disability or other condition, was more likely to suffer injury because of the defendant's negligence than a normal person would, then the defendant is responsible for that injury. A defendant may not avoid responsibility for his or her negligent actions by showing that the injury would have been less serious if it had happened to someone else.

caused the jury to minimize (relatively speaking) his damages. Like the trial judge, we conclude that as the case was actually tried, that instruction had no relevance to the assessment of damages the jury was called on to make.

The instruction reflects the "firmly established principle of tort law that a tortfeasor takes his victim as he finds him," *Bushong v. Park*, 837 A.2d 49, 55 (D.C. 2003), so that "[a] negligent actor must bear the risk that his liability will be increased by reason of the actual physical condition of the other toward whom his act is negligent." *Gubbins v. Hurson*, 987 A.2d 466, 469 (D.C. 2010) (quoting RESTATEMENT (SECOND) OF TORTS § 461 (1965) (italics deleted)).[6] In the present case, there was conceded evidence that Willis came to the Hospital with pre-existing medical conditions (or "risk factors") including diabetics, obesity, hypertension, and a history of smoking. He thus argues that, without the special susceptibility instruction, the jury may have unfairly reduced or discounted his damages to the extent it saw these risk factors – all beyond the Hospital's control – as combining with the negligence to cause the need for the amputations.

---

[6] Instruction 13.08 relates to "the issue of (augmented) damages" and also, as we implied in *Gubbins*, *supra*, 987 A.2d at 469-70, to the issue of proximate causation.

What Willis ignores, however, is that the Hospital tried the case on the theory that an independent cause, not its alleged negligence, combined with his prior conditions to necessitate the amputation. It presented evidence through two medical experts that "sepsis or a syndrome related to infection in his buttock abscess," developing only after his release from the Hospital, combined with his pre-existing debilities (as "a diabetic and former smoker") to cause a blockage of arteries, eventual gangrene, and the need for amputation. This progression that began with wound contamination, those experts maintained, was unrelated to the DVT and any attendant negligence, and the Hospital thus did not imply, in questioning of witnesses or closing argument, any mitigating link between the DVT and Willis's pre-existing conditions.

The jury was free, of course, to reject the Hospital's causal theory wholly or in part and find, as it did, that the DVT and its sequelae were a substantial contributor to the loss of Willis's legs. But in assessing the damages to be awarded, the jury would have received no guidance from an instruction designed to forestall a mitigation (or minimization) argument that was not part of the case actually tried.

It is true, as Willis argues relatedly, that the jury's award of $50,000 for past medical expenses – chiefly associated with the amputation of his legs – seems quite small when the actual medical expenses he incurred were some $275,000. But, as Judge Kravitz pointed out, the issue of causation was "hotly contested" in the manner we have described, with the Hospital contending that the amputation stemmed causally from something unrelated to the deep venous thrombosis and antecedent negligence. Thus the jury, while finding that the negligence was indeed a contributing cause, may have been unwilling to attribute more than a modest portion of the amputation-linked expenses to something it did not believe had predominantly necessitated the amputation. Any skepticism this court may have about that conclusion is beside the point. Our standard of review, *see Posner v. Holmes*, 739 A.2d 358, 360-61 (D.C. 1999), and the substantive impediments the law erects to overturning a jury's award of damages as inadequate, *id*. at 361; *Prins-Stairs v. Anden Grp.*, 655 A.2d 842, 843 (D.C. 1995), make it impossible for us to substitute our judgment for the jury's on any component of the damages it awarded.

*Affirmed*.

# <u>APPENDIX</u>

Filed
D.C. Superior Court
07/22/2013 17:01PM
Clerk of the Court

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| **JOHN WILLIS,** | ) | **Case No. 11 CA 8643** |
|    **Plaintiff** | ) | |
| | ) | |
|    **v.** | ) | **Calendar 13 - Judge Kravitz** |
| | ) | |
| **WILLIAM JAMES BROWNLEE,** | | |
|               **et al**., | ) | |
|    **Defendants** | ) | |

## <u>ORDER ON POST-TRIAL MOTIONS</u>

This medical malpractice case was tried to a nine-person Superior Court jury beginning on April 15, 2013. On May 1, 2013, after nine days of trial and approximately five hours of deliberations over two days, the jury returned a unanimous verdict finding (1) that defendant William Brownlee III, the surgeon who performed two surgical procedures on the plaintiff at Providence Hospital in September 2008, did not breach the standard of care by failing to prescribe Heparin and sequential compression devices (SCDs) at the time of the plaintiff's first surgery on September 5, 2008 or by failing to prescribe Heparin at the time

of the plaintiff's second surgery on September 10, 2008; (2) that nurses employed by defendant Providence Hospital did breach the standard of care by failing to place SCDs on the plaintiff's legs in accordance with Dr. Brownlee's order to do so dated September 10, 2008; (3) that the failure of the hospital nurses to apply SCDs following the second surgery on September 10, 2013 was a proximate cause of injury to the plaintiff; and (4) that damages to the plaintiff proximately caused by the nurses' breach of the standard of care were in the amount of $50,000.00 for past expenses for medical and other care; $450,000.00 for future expenses for medical and other care; and $150,000.00 for past and future non-economic damages (including physical pain, emotional distress, disfigurement, and inconvenience). In accordance with the jury's verdict, the court entered judgment on May 1, 2013 in favor of the plaintiff and against Providence Hospital in the amount of $650,000.00; the court also entered judgment for Dr. Brownlee on the plaintiff's claims against him. The court stayed the judgment pending the outcome of anticipated post-trial litigation.

The case is now before the court on the hospital's renewed motion for judgment as a matter of law, *see* Super. Ct. Civ. R. 50(b), and the plaintiff's motion for a new trial on damages, *see* Super. Ct. Civ. R. 59(e). The hospital contends in its motion – as it did at the end of the plaintiff's case-in-chief and

again at the end of all of the evidence at trial – that the expert testimony and other evidence presented by the plaintiff was legally insufficient to prove by a preponderance of the evidence that the failure of the hospital's nurses to apply the SCDs ordered by Dr. Brownlee on September 10, 2008 proximately caused the plaintiff's deep venous thrombosis (DVT) and pulmonary embolus (PE) and, ultimately, the plaintiff's bilateral below- the-knee amputations. In particular, the hospital argues that the plaintiff's evidence of causation was fatally speculative, as even the plaintiff's own experts conceded that SCDs are largely ineffective once DVT has formed and that it is impossible to know whether the plaintiff's DVT formed before or after the second surgery on September 10, 2008. The plaintiff argues in his motion for a new trial on damages that the court erroneously denied his request for Standard Jury Instruction No. 18-8 on "special susceptibility" and that the $650,000.00 in total damages awarded by the jury was so inadequate as to warrant a new trial.

The plaintiff and the hospital have filed oppositions to each other's motions, and the hospital has filed a reply in support of its renewed motion for judgment as a matter of law. Dr. Brownlee, whose defense verdict remains unchallenged by either of the other parties, has not filed a response or otherwise participated in the post-trial litigation.

The court has carefully considered the pending motions, oppositions, and reply, as well as the transcripts and other materials appended to the parties' briefs and the entire record of the case. For the reasons that follow, the court concludes, as a matter of law, that the evidence of proximate causation presented in the plaintiff's case-in-chief was sufficient to support the jury's verdict against the hospital; the court also concludes, in its discretion, that the amount of damages awarded by the jury was not so inadequate as to warrant a new trial. Both post-trial motions therefore will be denied.

## DISCUSSION

### Hospital's Renewed Motion for Judgment as a Matter of Law

The plaintiff in a medical malpractice case has the burden of proving the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between the defendant's deviation and the plaintiff's injury. *Derzavis v. Bepko*, 766 A.2d 514, 519 (D.C. 2000). Expert testimony is required to prove all three of the required elements, including causation, except where the proof is so obvious as to lie within the ken of the average lay juror. *Washington v. Washington Hospital Center*, 579 A.2d 177, 181 (D.C. 1990). The purpose of expert opinion testimony is to avoid jury findings that are based on mere speculation or conjecture. *Lasley v. Georgetown University,* 688 A.2d 1381, 1385

(D.C. 1997).

As a general matter, to establish proximate cause "the expert need only state an opinion, based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of the plaintiff's injury." *Travers v. District of Columbia*, 672 A.2d 566, 570 (D.C. 1996); *see generally Talley v. Varma*, 689 A.2d 547, 552 (D.C. 1997) ("To establish causation, the plaintiff must present evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries, and that the injuries were foreseeable."). On the other hand, although "conflicts in the testimony of witnesses, including expert witnesses, called by a party are not necessarily fatal to his case," *Kosberg v. Washington Hospital Center*, 394 F.2d 947, 950 (D.C. Cir. 1968), "inconsistent testimony on causation may render the whole testimony inconclusive, thus requiring the entry of a directed verdict," *Talley*, 689 A.2d at 553.

It is this last point that is at the core of the question currently before the court. Dr. Jesse Hall, a professor of anesthesiology and critical care medicine at the University of Chicago and chief of the Department of Pulmonary and Critical Medicine there, was accepted as an expert witness

for the plaintiff without objection from the defendants. On direct examination, Dr. Hall clearly stated his opinion, to a reasonable medical certainty, that the nurses' failure to follow Dr. Brownlee's order to apply SCDs following the second surgery on September 10, 2008 "was a cause and a substantial factor in causing [the plaintiff] to lose his legs and to suffer the injuries he did at Prince Georges Hospital." On cross-examination, however, Dr. Hall admitted that he could not say whether the plaintiff's DVT started to develop before or after the second surgery – a point also conceded by another of the plaintiff's experts, Dr. Paul Collier – and he agreed that SCDs "have not much of a role" once DVT has become "well-established." The hospital argues, based on those admissions, that the jury must have engaged in impermissible speculation about the timing of the formation of the plaintiff's DVT to find that the nurses' failure to apply SCDs after the surgery on September 10, 2008 was a proximate cause of the plaintiff's subsequent injuries – *i.e.* the hospital contends that the jury necessarily speculated that the DVT formed after the second surgery in determining that the application of SCDs as ordered by Dr. Brownlee more likely than not would have prevented the development of DVT and the subsequent amputations.

Essential to the hospital's position is the notion that SCDs are

ineffective in preventing DVT once it has begun to form. If that is true, then the inability of the plaintiff's experts to say whether the plaintiff's DVT began to form before or after the second surgery would mean that the jury must have speculated in finding that the nurses' failure to apply SCDs at the time of the second surgery made a difference in the outcome for the plaintiff.

The evidence on this essential point, however, was not as clear as the hospital suggests. Dr. Hall testified as follows on cross-examination:

> Q: I guess to ask it maybe more succinctly: You're not able to tell the ladies and gentlemen of the jury whether you have an opinion as to – that the – that the DVT started to form before or after the second surgery, is that correct?
>
> A: It could have been either.
>
> Q: And the jury heard testimony from Dr. Collier the other day, one of the plaintiff's experts, who said he couldn't say one way or another when it developed – or started to develop, in your vernacular. Is that correct?
>
> A: I would agree with that.
>
> Q: And let's talk a little bit about SCDs, if we could. If the DVT was forming prior to the second surgery – which is a question we can't answer, correct?
>
> A: Correct.

Q: But if it were, SCDs would not have been helpful in preventing – further preventing the DVT, is that correct?

A: In general it is viewed that once the clot begins, all of the prophylactic measures are going to be less effective.

Q: And as a matter of fact, you have some concern as to whether SCDs might be – might be bad for that situation, is that correct?

A: They could be if it were very advanced. They could cause trouble.

Q: *So we can agree that it's not likely that SCDs would have retarded the growth of the clot once it had started. Is that correct?*

A: *Well, I don't know about once it had started, but it if was a well-established deep venous thrombosis, then I think most people believe that SCDs have not much of a role from that point forward.*

Hall transcript, 4/22/13, at 64-65 (emphasis added).

This testimony on cross-examination certainly raised questions about the credibility of Dr. Hall's testimony on direct examination that, to a reasonable medical certainty, the nurses' failure to apply SCDs as ordered on September 10, 2008 was a proximate cause of the plaintiff's amputations and other injuries. But the hospital's lawyer did not ask the follow-up question that might have entirely undercut Dr. Hall's direct examination testimony and resolved the causation

question once and for all (and as a matter of law) in favor of the hospital. Specifically, counsel did not ask Dr. Hall if he could say with reasonable medical certainty whether the plaintiff's DVT became well-established before or after the second surgery; an admitted inability to answer that question likely would have laid bare the speculative nature of the plaintiff's contention that the application of SCDs beginning on September 10, 2008 would have prevented his DVT. The hospital's lawyer, however, moved on to another subject and left unchallenged the lingering inference from Dr. Hall's testimony on cross-examination – that SCDs are effective in preventing DVT even after a clot has begun to form, as long as they are applied before the clot has become well-established.

This testimony from Dr. Hall on cross-examination – and the permissible inference that arose from it – combined with other expert testimony presented at trial to create a sufficient factual and evidentiary basis for Dr. Hall's direct examination testimony and, ultimately, for a jury finding that the application of SCDs beginning at the time of the second surgery more likely than not would have prevented the plaintiff's DVT. In particular, Dr. Hall testified that the plaintiff's risk factors for DVT accumulated over the course of his stay at Providence Hospital and increased significantly with the second surgery on September 10, 2008, as the second surgery caused an even greater decrease in the plaintiff's

mobility and the additional cutting of tissue associated with the second surgery likely caused an even greater increase in the natural clotting reaction in the plaintiff's body, Hall transcript, 4/22/13, at 30-31, 60; importantly, Dr. Hall also testified that the development of DVT (and PE) is a gradual process that typically stretches over a period of days:

> In addition, this process doesn't happen in minutes or hours. It's not the case that you develop a clot in the leg and then it immediately is huge and breaks loose and immediately gives you a pulmonary embolus. It's a gradual process. And, in fact, what happens first is the risk factors accumulate and you begin to get clot in very small veins. And then if the process isn't turned around, the clot begins to extend up the leg to deeper veins. In fact, that's the point at which we call it deep venous thrombosis. And by definition, that means it's at the level of the knee or higher, moving up your leg. And then from that point it grows further and eventually can break loose or parts of it could break loose. And then you have pulmonary emboli. . . . So that whole process taking days to evolve puts it back to Providence Hospital when it occurred.

Hall transcript, 4/22/13, at 32. *See also id.* at 65 (describing the development of DVT and PE as "a days-long process in most cases").

Given the brief period between the two surgeries (five days), Dr. Hall's testimony that that the plaintiff's risk of developing DVT increased significantly with the second surgery, and the permissible inference from his testimony – that

SCDs are effective in preventing DVT as long as they are applied before the DVT is well-established – the jury could have put all of this together and reasonably concluded, without engaging in impermissible speculation or conjecture, that the plaintiff's DVT did not become well-established until after the second surgery, and that the application of SCDs beginning on September 10, 2008 would have prevented the formation of a well-established DVT and all that followed. The jury thus could have determined, without speculating, that the nurses' failure to apply the SCDs in accordance with Dr. Brownlee's order proximately caused the plaintiff's DVT and subsequent bilateral below-the-knee amputations.

The weakest aspects of the plaintiff's evidence of causation were that Dr. Hall said the formation of DVT and PE (not the formation of DVT alone) was a days-long process, and that neither Dr. Hall nor any other expert ever said the plaintiff's DVT probably became well- established only after the second surgery. These weaknesses provided the bases for the strongest arguments on causation available to the hospital at trial. However, no one ever asked Dr. Hall how long it usually takes for DVT alone to become well-established, nor did anyone ever ask him if he could say with reasonable medical certainty whether the plaintiff's DVT became well- established before

or after the second surgery. These omissions are important, because the court, in judging the legal sufficiency of the plaintiff's evidence, must view the testimony in the light most favorable to the plaintiff and must draw all reasonable inferences in support of the plaintiff's claim. Having done so, the court is satisfied that the expert testimony and other evidence gave rise to a reasonable inference that the plaintiff's DVT was not yet well-established when the nurses breached the standard of care by failing to implement Dr. Brownlee's order for SCDs beginning on September 10, 2008 (and that Dr. Hall believed this to be the case). Put another way, the court concludes that the jury reasonably found, based on legally sufficient evidence, that more likely than not there was a direct and substantial causal relationship between the nurses' breach and the plaintiff's injuries.

This was a very close case on the issue of causation. But in the final analysis, it was not a case in which the expert testimony was so inconsistent as to "render the whole testimony inconclusive, thus requiring the entry of a directed verdict." *Talley*, 689 A.2d at 553. Dr. Hall never withdrew or even backed away from his opinion that the nurses' negligence proximately caused the plaintiff's amputations, and the evidence, although hotly contested, was sufficient to support

his opinion.

The hospital argues that the Court of Appeals decision in *Travers*, 672 A.2d 566, requires a different result. This court disagrees. *Travers* is difficult to analyze, as the majority opinion contains very little information about the expert testimony found legally insufficient to prove proximate cause. Yet it appears that the plaintiff in that case presented no expert testimony analogous to Dr. Hall's testimony here suggesting that SCDs would have been effective had the plaintiff's DVT begun to form but not yet become well-established at the time of the medical negligence at issue.

The hospital also suggests that the causation testimony of the plaintiff's experts should have been excluded at trial as internally inconsistent and lacking a sufficient factual basis. This suggestion has no merit. The causation opinions of the plaintiff's experts were admitted at trial without objection by the hospital, and the hospital is thus foreclosed from raising the question of admissibility for the first time in a post-trial motion. The appropriate question at this stage of the proceedings is not whether the testimony of the plaintiff's experts was properly admitted, but whether the testimony, in combination with the other evidence presented in the plaintiff's case- in-chief, was legally sufficient to prove a causal link between the nurses' failure to apply SCDs as directed beginning on

September 10, 2008 and the plaintiff's development of DVT and subsequent bilateral below-the-knee amputations. For the reasons already stated, the court concludes that the evidence, viewed in the light most favorable to the plaintiff, was legally sufficient to support the jury's finding of proximate causation by a preponderance of the evidence. The hospital's renewed motion for judgment as a matter of law therefore must be denied.

### Plaintiff's Motion for New Trial on Damages

The court concludes, in its discretion, that the plaintiff's motion for a new trial on damages also should be denied. First, the court, which presided over the trial and has a clear memory of the proceedings, remains of the view that a jury instruction on special susceptibility was not appropriate in the circumstances. The evidence at trial relating to the plaintiff's pre-existing medical conditions (diabetes, hypertension, obesity, and infection) had only limited points of relevance – the effect of those conditions on the applicable standard of care concerning the use of Heparin and/or SCDs to prevent the formation of DVT, and the likelihood that the plaintiff's DVT and resulting PE (as opposed to one or more of the pre-existing conditions) proximately caused the below-the-knee amputations of the plaintiff's legs. Neither defendant argued at trial that the plaintiff's injuries resulting from the nurses' failure to apply SCDs in accordance

with Dr. Brownlee's order of September 10, 2008 would have been less severe had the plaintiff not already been afflicted with diabetes, hypertension, obesity, and infection.

Second, the court is not persuaded that the $650,000.00 verdict returned by the jury was so inadequate as to warrant a new trial on damages. The verdict resulted from the jury's consideration of hotly contested and contradictory evidence on the issues of liability, causation, and damages. Supported by expert testimony, the hospital presented a spirited defense on the question whether there was a causal link between the nurses' failure to apply SCDs after the second surgery and the amputation of the plaintiff's legs, as well as on the question whether the damages claimed by the plaintiff and his experts – and in particular, the damages sought for future medical and other expenses – were reasonable in light of the circumstances and the evidence. Although the court is not surprised to learn that the plaintiff hoped or even expected to receive a larger damages award from the jury, the court does not find that the verdict was the product of prejudice, passion, or partiality on the part of the jury or that it was the result of the jury's oversight, mistake, or consideration of irrelevant or improper information. Nor, in the court's view, was the verdict beyond or contrary to all reason. *See Romer v. District of Columbia*, 449 A.2d 1097, 1099 (D.C. 1982) ("[I]n reviewing the

denial of a motion for a new trial based on a claimed inadequate verdict, this court will reverse only when the amount of the award evidences prejudice, passion or partiality on the part of the jury or where the verdict appears to be an oversight, mistake, or consideration of an improper element."); *see also Prins- Stairs v. The Anden Group*, 655 A.2d 842, 843 (D.C. 1995) (stating that "the court should order a new trial only when the award is *contrary to all reason*") (quoting *Barron* v. *District of Columbia*, 494 A.2d 663, 665 (D.C. 1985)). The jury, which appeared to the court throughout the trial to be paying very close attention to the evidence, arguments, and instructions, awarded the plaintiff more money for his future medical and other expenses than the hospital's experts testified was reasonably necessary. The jury also reasonably may have considered the plaintiff's demeanor during the trial, and his apparent acceptance of his diminished physical condition, in deciding to award less in non-economic damages than the plaintiff anticipated. In the end, the court is satisfied, given the jury's prerogative to accept or reject the expert and lay evidence presented, that the verdict was within the range of rational findings and conclusions based on the evidence in the record. The court therefore concludes that it should defer to the jury's judgment and leave the verdict undisturbed.

## CONCLUSION

For the foregoing reasons, it is this 22nd day of July 2013

**ORDERED** that the hospital's renewed motion for judgment as matter of law is **denied.** It is further

**ORDERED** that the plaintiff's motion for a new trial on damages is **denied.** It is further

**ORDERED** that the stay on the judgment entered on May 1, 2013 is lifted and that the judgment is now in full force and effect.


/s/ Neal E. Kravitz

_____
Neal E. Kravitz, Associate Judge
(Signed in Chambers)


Copies to:

Sandra H. Robinson, Esq.
Karen E. Evans, Esq.
D. Lee Rutland, Esq.
Donald DeVries, Esq.
Craig S. Brodsky, Esq.
Erin Miller, Esq.
*Via CaseFileXpress*