*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CV-0593

KS CONDO, LLC, APPELLANT,

v.

FAIRFAX VILLAGE CONDOMINIUM VII, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2019-CA-006922-B)

(Hon. Maurice A. Ross, Trial Judge)

(Argued June 8, 2023                    Decided September 28, 2023)

*Jonathan M. Stern* for appellant.

*Thomas C. Mugavero* for appellee.

Before DEAHL and SHANKER, *Associate Judges*, and FISHER, *Senior Judge*.

DEAHL, *Associate Judge*: This case stems from the collapse of a foundation wall in a multi-unit condominium, leaving the building uninhabitable for almost a year. KS Condo, the owner of one of the units, sued the condo association for negligent failure to perform necessary maintenance. At a bench trial, KS Condo adduced unrefuted evidence showing that while the condo association had been

aware of "serious" and "urgent" structural deficiencies in the foundation wall for more than two years, it had undertaken no repairs to remedy those conditions. Despite this evidence, the trial court ruled in the condo association's favor, reasoning that KS Condo's failure to offer expert testimony as to the appropriate standard of care and on the question of causation meant as a matter of law that it could not prevail on its claims. Because we conclude that expert testimony was not required to prove either element of KS Condo's negligence claim, we vacate the trial court's judgment and remand for further proceedings.

**I.**

The pertinent facts are largely undisputed. KS Condo owned a unit in 3810 V Street SE, one of the many buildings comprising Fairfax Village, a condominium complex located in Southeast D.C. Fairfax Village was managed by Fairfax Village Condominium VII, or Fairfax for short, a condominium association led by a board of directors. Fairfax was responsible for maintaining the complex's common elements, including the buildings' foundation walls. Individual unit owners, such as KS Condo, were not permitted to undertake their own repairs to common elements. Fairfax's bylaws authorized it to levy special assessments if necessary to fund the

cost of unexpected repairs. The bylaws also authorized it "to sue for foreclosure to collect liens for unpaid condominium dues."

For more than two years before the foundation wall in 3810 V Street collapsed, Fairfax's board was on notice that the wall, if not promptly repaired, was at risk of imminent and catastrophic collapse. At a board meeting in March 2015, a property management report listed the foundation wall as a "SERIOUS" issue and proposed that the board agree on a short-term plan "to pay for urgent property repair that needs to start within 30 days." Nine months later—i.e., eight months after Fairfax indicated the repairs needed to start—the board finally hired a contractor, Property Diagnostics, Inc., to inspect the property.

Property Diagnostics completed a site visit and summarized its findings for Fairfax in a succinct written paragraph in December 2015. It noted "serious structural problems" that it urged the board to repair "as soon as possible," emphasizing that "[d]elaying action could result in the building collapsing." It recommended engaging "a structural engineering firm" immediately, and closed with this: "We cannot over emphasize the danger of the condition."

The board promptly hired a structural engineering firm, the Falcon Group, which similarly reported in December 2015 that there was "[b]uckling on the rear

foundation block wall of the building, from end to end" that "needs to be addressed and resolved as soon as possible." That report listed several recommended courses of action to remedy the situation, including rebuilding the entire foundation wall or installing steel beam foundation reinforcements. It also included six photographs showing massive cracks in the wall from multiple angles. The engineering firm submitted a proposal the following month, in January 2016—still more than 18 months before the wall's collapse—to oversee the bidding, obtain the necessary permits, and manage the project.

At a homeowners' meeting four months later, in May 2016, Fairfax's board noted that the foundation wall repairs were one of its "top 3 projects" and could "wait no longer," as the association was "at risk of lawsuits from not performing these repairs." A slide deck presented at this meeting included a photograph of the buckling wall, accompanied by a note stating that financing the projects needed to happen "ASAP!!!" Around the same time, the board reviewed calculations for a potential special assessment—a fee that would be charged to all condo owners—to fund the repairs. The board president emailed the draft calculations to her colleagues and added that they "need to make some decisions" so that owners would have at least thirty days' notice before beginning repairs. At that time, Fairfax was operating with a budget shortfall, primarily because some of its members had failed to pay

association fees. By July 2016, Fairfax approved Falcon's proposal to do the engineering work and manage the bidding process. During the remainder of 2016, Fairfax did not take steps to secure the necessary funding for the proposed project.

In February 2017, the first bidder did an onsite assessment and quoted a cost of more than $200,000 for the repair work. The board president then emailed the rest of the board, asking them to "review the design plans that [she] sent a few months ago from Falcon, so that all of us are clear on project scope." It was around this time that KS Condo purchased the unit at issue here, above the buckling wall. A KS Condo representative testified that they were not aware of a problem with the basement foundation wall because they had never been given access to inspect it.

In the months that followed, now entering the final few months before the collapse, the board continued to call attention to the "URGENT" and "SERIOUS" need for repairs in its reports. At another homeowners' meeting, the board explained that it was "inquiring about a possible loan for this project" to avoid a special assessment. One lender provided a draft loan agreement, but the board ultimately declined it after concluding that it had too many unfavorable terms, and it then tabled the issue.

Several weeks after that, in July 2017, the foundation wall collapsed, rendering KS Condo's unit, which it leased out to tenants, uninhabitable for nearly a year. Three months after the collapse, Fairfax obtained a $1 million loan to repair the damage and complete other projects.

KS Condo sued Fairfax, seeking $35,000 as compensation for its lost rental income and to recoup expenses associated with relocating its existing tenant. The case proceeded to a bench trial, where the trial court ruled in Fairfax's favor. The court observed that "Fairfax had responsibility for maintenance, repair, renovation, restoration, and replacement of the common elements" of Fairfax Village. *See* D.C. Code § 42-1903.07(a)(1). And it further noted that "Fairfax's duty was to act as a reasonable condominium association would act under the same or similar circumstances." But the court concluded that KS Condo could not prevail because it failed to introduce expert testimony on two critical topics: (1) there was no expert testimony opining on the condo association's standard of care in maintaining the common areas, and (2) there was no expert testimony establishing a "connection between the prior warnings and the collapse."

As to duty, the court elaborated that it was "beyond the ken of the average lay juror, or judge sitting without a jury, to identify the appropriate standard of care to

which a condominium association must be held for remedial repairs."  Thus, an expert in property management was needed to elucidate the appropriate standard of care.  Without this expert testimony, the court concluded, KS Condo was "unable to prove a breach of that standard," and KS Condo's arguments about what Fairfax could or should have done in this situation—such as special assessments to fund emergency repairs or taking out loans—were "speculative."

As to causation, the court reasoned that while it was undisputed that the foundation wall had collapsed in July 2017, "[t]here is no expert testimony as to why."  Thus, in the court's view, KS Condo had failed to establish that the actions of Fairfax had caused its injury, as "it is impossible to say whether intervening factors existed and whether the proposed work on the structure would have prevented the collapse."  KS Condo now appeals.

## II.

"The plaintiff in a negligence action bears the burden of proving 'the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'"  *District of Columbia v. Hampton*, 666 A.2d 30, 35 (D.C. 1995) (quoting *Meek v. Shepard*, 484 A.2d 579, 581 (D.C. 1984)).  In other words, to establish a negligence claim, a

plaintiff must demonstrate that: (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the defendant's breach proximately caused an injury to the plaintiff. *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011) (en banc). As the plaintiff, KS Condo bore the burden of proving each of these elements by a preponderance of the evidence. "In an appeal from a bench trial, we review the trial court's legal conclusions de novo and factual findings for clear error." *District of Columbia v. Bongam*, 271 A.3d 1154, 1162 (D.C. 2022).

The parties initially disagree about our standard of review. Fairfax argues that, in the District, whether expert testimony is required on an issue is committed to the sound discretion of the trial court. *See District of Columbia v. Davis*, 386 A.2d 1195, 1200 (D.C. 1978) ("[T]he decision whether or not to admit (and presumably to require) expert testimony is within the discretion of the trial court."); *District of Columbia v. Tulin*, 994 A.2d 788, 795 (D.C. 2010) (This court reviews "for abuse of discretion the trial court's determination as to whether expert testimony was necessary."). KS Condo counters that this is essentially a legal judgment that "should be reviewed de novo," citing to a smattering of other jurisdictions that have adopted that view. *See, e.g.*, *Culliton v. Hope Cmty. Res., Inc.*, 491 P.3d 1088, 1093 (Alaska 2021) ("Whether expert testimony is required to show a breach of a duty of care represents a question of law to which we apply our independent judgment.");

*Bittner v. Centurion of Vt., LLC*, 264 A.3d 850, 855 (Vt. 2021) (whether "claim requires expert testimony is a question of law that we review without deference"); *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 90 (Tex. 2004) ("de novo is the proper standard of review in this context"). While we have some sympathies with the approach taken in other jurisdictions, our precedents instruct that we apply an abuse of discretion standard of review to the question at hand, and we do so.[1]

Even under an abuse of discretion standard, however, we conclude that expert testimony was not necessary to establish a breach of the duty of care or causation in this case. These were commonsense questions left to a factfinder to resolve by a preponderance of the evidence, and they were capable of being adjudged without the aid of an expert. The gravamen of KS Condo's complaint was that Fairfax had a

---

[1] Our precedents applying an abuse of discretion standard generally trace back to *Davis*, which offered no reasoning but merely "presum[ed]" that the abuse of discretion standard we apply to decisions to admit expert testimony should be extended to a ruling that such testimony is required to sustain a claim. 386 A.2d at 1200. Those are meaningfully different questions, however. While the first one indeed involves a degree of discretion, the second appears to be a legal question that probes whether the evidence is sufficient to sustain a verdict absent expert testimony. To illustrate the point, the trial court's reasoning here would have supported summary judgment in Fairfax's favor: the court reasoned, as a matter of law, that KS Condo could not succeed without expert testimony. And we review grants of summary judgment de novo. *Brown v. Raines*, 293 A.3d 1116, 1119 (D.C. 2023). Still, we have unequivocally stated in a number of cases that the applicable standard is abuse of discretion, and so we adhere to those precedents.

duty to reasonably maintain the foundation wall, but failed to do so despite years' worth of clear and obvious warnings about the foundation wall's imminent collapse. One does not need to know anything about condo associations—themselves typically made up of laypersons—to assess whether the delays here were reasonable. Similarly, there was no need for expert testimony to establish causation. A factfinder could easily conclude on this evidence, without aid from an expert, that the foundation wall collapsed for the very reason that multiple experts had predicted it would collapse in the years before that happened: a lack of urgently needed repairs. We now elaborate on each of these points.

**A.**

We begin with the trial court's conclusion that KS Condo was required to produce expert testimony to establish the scope of Fairfax's duty, and that absent such testimony, KS Condo could not establish that Fairfax breached its duty. In determining whether expert testimony is required to carry a plaintiff's burden of proof, we ask whether "lay jurors would be able to 'grasp the issues without expert

assistance.'" *Blair v. District of Columbia*, 190 A.3d 212, 229 (D.C. 2018) (quoting *Tulin*, 994 A.2d at 795).[2]

While expert testimony is required to establish a duty of care in some negligence cases, there are plenty of other cases where it is not required. "[W]here a plaintiff alleges negligent conduct in a 'context which is within the realm of common knowledge and everyday experience, the plaintiff is not required to adduce expert testimony either to establish the applicable standard of care or to prove that the defendant failed to adhere to it.'" *Tolu v. Ayodeji*, , 601 (D.C. 2008) (quoting *Varner v. District of Columbia*, 891 A.2d 260, 265 (D.C. 2006)). Outside the realm of professional malpractice cases, we have explained, "causes of action that *require* expert testimony are 'rare.'" *Columbus Props., Inc. v. O'Connell*, 644 A.2d 444, 447 (D.C. 1994) (quoting *Payne v. Soft Sheen Prods., Inc.*, 486 A.2d 712, 727 n.17 (D.C. 1985)); *see also Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962) ("This is not

---

[2] We have retired the equivalent "beyond the ken" standard for determining the admissibility of expert testimony; in that context, a proponent of expert testimony need only clear the lower bar that the expert testimony be of some "help [to] the trier of fact [in] understand[ing] the evidence." *See Motorola Inc. v. Murray*, 147 A.3d 751, 756-57 & n.8 (D.C. 2016) (en banc) ("Our decision to adopt [Federal Rule of Evidence] 702 means, among other things, that we will no longer ask whether the subject matter is 'beyond the ken of the average layman.'"). But in determining whether a factfinder could reach a verdict in the absence of expert testimony, the question remains, essentially, whether the issues are beyond an average juror's grasp or ken. *Blair*, 190 A.3d at 229.

one of the rare causes of action in which the law predicates recovery upon expert testimony.").  In the mine-run of cases, questions of negligence are "within the realm of common knowledge and everyday experience," as they are grounded in ordinary judgments of reasonableness.  *Matthews v. District of Columbia*, 387 A.2d 731, 734-35 (D.C. 1978).

For three reasons, this was not one of those cases where lay jurors would have been at a loss in determining whether Fairfax acted negligently when it roughly ignored, for years, repeated warnings of the foundation wall's imminent collapse.

First, Fairfax acted through a board of directors who were themselves lay people and fellow residents of the condominium community.  Their jobs as board members were part-time and required no specialized knowledge.  A jury of lay persons would be equipped to understand the types of quotidian decisions the board's directors had to make such as prioritizing, approving, and funding repair projects.  The trial court as factfinder could therefore also assess, without the aid of expert opinions, whether the condo board acted reasonably.  *See Wash. Hosp. Ctr. v. Martin*, 454 A.2d 306, 308-09 (D.C. 1982) (distinguishing "ordinary" negligence cases "in which jurors may apply their own experience in deciding how any

reasonably prudent person would have acted under the circumstances" from cases in which the exercise of "professional judgment and skill" is at issue).

Second, Fairfax itself hired experts who alerted it to the buckling basement wall and themselves articulated the urgency of the situation and the dangerous situation that needed to be urgently addressed. The court was not tasked with deciding the correctness of those contractors' recommendations or conclusions—Fairfax never contested them. Rather, the question here was whether Fairfax acted reasonably when it seemingly ignored the specific and urgent warnings it received from its own experts. The trial court merely had to discern whether a years-long delay was a reasonable response to what the board itself described as an emergency situation. Expert testimony might potentially have informed that determination, but it was not necessary to come to a reasoned judgment about it.

Third, and relatedly, because Fairfax took no actions in response to its contractors' recommendations, there were no repairs for the factfinder to evaluate. The issue of breach could be resolved by determining whether undertaking no repairs at all was reasonable.[3] The quality, methods, and materials of construction—which

---

[3] Fairfax highlights that it did in fact take some steps to rectify the buckling foundation wall, such as hiring contractors to perform initial assessments and

might require some degree of expertise—were never at issue because zero work was done ahead of the collapse. *See Daskalea v. District of Columbia*, 227 F.3d 433, 445 (D.C. Cir. 2000) (no expert testimony required when the complained-of conduct was allowed to continue in a "persistent, open and notorious" fashion).

Our precedents support our conclusion. In *Washington Hospital Center v. Martin*, for example, we affirmed a verdict finding the hospital liable after an elderly patient fell from her bed, which the plaintiffs argued was caused by the staff's negligent failure to restrain her. 454 A.2d at 307. While the plaintiffs had offered no expert testimony on the proper standard of care at trial—and the hospital attempted to overturn the verdict on that ground—we held that no such testimony was necessary, as the plaintiff's case did not challenge the hospital staff's exercise of medical judgment. *Id.* at 308-09. Rather, "the issues before the jury were whether appellee was in fact under restraints immediately prior to her fall and, if not, whether the hospital was negligent in leaving her unattended." *Id.* at 308. Those questions, we concluded, could be answered by "a reasonable and ordinary lay person." *Id.* at 309.

---

inquiring about loans. A lay factfinder could likewise factor those actions into its determination of whether Fairfax acted negligently.

Similarly, *DeStefano v. Children's Nat'l Med. Ctr.* stemmed from a six-year-old child's fall through an open vent in a hospital's parking garage wall, leading to a twenty-five-foot drop through an air shaft. 121 A.3d 59, 64 (D.C. 2015). A metal cover for the vent was leaning against the wall nearby, and before the incident, a parking attendant had reported the hazard to a garage employee, who dismissed the concerns. *Id.* at 67. We held that the trial court did not err in determining that expert testimony was not required to establish a breach of the hospital's duty in this situation, explaining that: "It does not take special knowledge to know that a large, uncovered vent in the wall of a parking garage could be a hazard, or that taking reasonable steps, such as posting a warning or replacing the vent cover, could ameliorate the danger." *Id.* at 75.

The same is true here. It does not take special knowledge to know that a crumbling foundation wall could be a hazard, especially when Fairfax's own structural engineer had warned of its imminent collapse long before that ultimately came to pass. It also does not take special knowledge to establish that taking reasonable steps like rebuilding or reinforcing the wall could have ameliorated the danger, particularly when the board's hired contractors explained that they would do just that. The trial court had all the facts it needed to determine whether Fairfax's

inaction in the face of these conditions constituted a breach of its duty towards KS Condo, even absent expert testimony.

In concluding otherwise, the court relied primarily on *Katkish v. District of Columbia*, which concluded that expert testimony was necessary to assess a municipality's care and maintenance of trees in a "non-emergency situation." 763 A.2d 703, 706 (D.C. 2000). That case involved a man calling the D.C. Department of Public Works to complain about a "dead" and "leaning" tree, which fell on his house a week after his call. *Id.* at 704. But the resident "did not convey the emergency nature of the situation" because he "made no follow-up contacts" to D.C. arborists and did not take any other action besides his initial call. *Id.* at 705. Under those specific circumstances, we concluded that the trial court did not err in requiring expert testimony to elucidate "the standard of care the District of Columbia needed to meet to abate the situation," specifically, "when a leaning tree may create a dangerous situation requiring an emergency response and whether the likelihood of the tree falling is related to the condition of the tree, the street, or other circumstances." *Id.* at 706. Had the District, like Fairfax, taken no action for more than two years in *Katkish*—100 times longer than its week of inaction—we suspect the result in that case would have been different. And here, Fairfax had years of notice that this was an emergency situation: it was told in 2015, in no uncertain

terms, that "[d]elaying action could result in the building collapsing" and that "the danger of the condition" could not be "over emphasize[d]."[4]

The question before the trial court was whether Fairfax's protracted inaction was reasonable when confronted with dire warnings from its own hired experts. It was capable of answering that question, one way or another, without the aid of expert testimony.

**B.**

We next consider whether the trial court erred in concluding that expert testimony was required to determine whether Fairfax's inaction proximately caused

---

[4] Two other cases that the trial court cited are even more clearly not analogous to this case. In *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 429 (D.C. 2000), we held that "expert testimony is required to establish the national standard of care for the operation and maintenance of a municipal water system and the handling of leaks in that system." At issue in that case was whether the District's response to a ruptured water main pipe, which it resolved in four to five hours, was unreasonably delayed when "the task could have been accomplished in one to two hours." *Id.* at 430. That question, we concluded, was not something "within the realm of common knowledge and everyday experience." *Id.* at 433. But the trial court here was not asked to opine upon a delay of hours, but of years. The trial court also cited *District of Columbia v. Billingsley*, 667 A.2d 837, 843 (D.C. 1995), a case that centered on a lack of evidence in the record to show that the District's actions caused the plaintiff's sewage backup. We explained in dicta that aspects of the standard of care "might be best developed through expert testimony" but that "there was scant evidence" on which an expert could form an opinion in the first place. *Id.*

the wall to collapse and financially injured KS Condo.  The trial court concluded that the cause of the wall collapse was "all speculative" because it was "impossible to say whether intervening factors existed and whether the proposed work on the structure would have prevented the collapse."  Continuing this line of thinking on appeal, Fairfax suggests that a rainstorm could have contributed to the wall's collapse.  KS Condo argues that, by requiring it to rule out all possible intervening factors, the court essentially held KS Condo to a "beyond reasonable doubt" burden, rather than the applicable preponderance of evidence standard.  We agree.

A factfinder could conclude that Fairfax's inaction more likely than not caused the foundation collapse in the condo unit.  A host of facts readily pointed to that conclusion, including that (1) Fairfax was repeatedly warned, in no uncertain terms, that it must act immediately to remedy a hazardous condition; (2) Fairfax understood the gravity of the situation and continually described it as an urgent, top priority; (3) Fairfax nonetheless took years to solicit bids and apply for the necessary funding, with long fallow periods scattered throughout the years before the collapse; (4) no work had commenced in the more than two years during which Fairfax knew of the problem; and (5) the very danger that Fairfax was repeatedly warned of came to pass.  On much closer facts, we have explained that a plaintiff can prove causation without needing "to disprove" or "rule out" every other conceivable possibility.

*Providence Hosp., Inc. v. Willis*, 103 A.3d 533, 535 (D.C. 2014); *see also id.* at 535 n.3 (a medical malpractice plaintiff establishes causation by showing that a hospital's "negligence 'more likely than anything else' contributed to his injury" but need not "rule out the 'anything else'"). A factfinder can put two and two together without the help of an expert mathematician explaining how to do so.

Perhaps, as Fairfax speculates, a rainstorm contributed to the wall's collapse. But an expert was not required to rule out such possibilities. A thing about solid foundation walls is that mere rainstorms do not cause them to collapse. One does not need to be a structural engineer to know that; they need only observe the world around them. And Fairfax did not even argue at trial that some contributing cause obviated Fairfax's own negligence in failing to maintain the wall in a safe condition. It instead essentially argued that it acted with reasonable speed and diligence to address the wall's condition. We conclude that a factfinder can assess that question without the aid of an expert.

## III.

For the foregoing reasons, we vacate the trial court's judgment and remand for further proceedings consistent with this opinion. We are not directing a verdict,

but concluding only that expert testimony is not necessary to support a verdict in KS Condo's favor.

*So ordered.*