**Eric M. PITT–BEY, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 04–CT–1063.**

District of Columbia Court of Appeals.

Argued Jan. 3, 2006.

Decided Feb. 14, 2008.

Eric M. Pitt–Bey, pro se.

Sidney R. Bixler, Assistant Attorney General for the District of Columbia, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the brief was filed, Edward E. Schwab, Deputy Attorney General for the District of Columbia at the time the brief was filed, and Rosalyn Calbert Groce, Assistant Attorney General for the District of Columbia, were on the brief, for appellee.

Before RUIZ, Associate Judge, and KERN and SCHWELB,* Senior Judges.

RUIZ, Associate Judge:

Eric Pitt–Bey appeals his conviction of failure to obey the lawful order of a police officer, claiming he was immune from prosecution in the Superior Court and that he was forced to testify at trial. We conclude that the trial court had jurisdiction over appellant, but we agree with appellant that, if he was compelled to testify, his conviction must be reversed. On the existing record, however, we cannot determine whether appellant's testimony was, in fact, compelled and not the result of his own decision to take the stand. Therefore, we remand the case for further proceedings to supplement the record on the circum-

stances surrounding appellant's taking the stand at trial.

## I.

Appellant was convicted, after a bench trial, of failing to obey a police officer's lawful order, in violation of 18 DCMR § 2000.2 (2001). At trial, Officer Korson, who was the government's sole witness, testified that he ordered appellant to stand on a curb and not approach the vehicle where his associate, Rahsaan Butler–EL, was being detained pursuant to a traffic stop, but that appellant nonetheless stepped off the curb and approached the stopped car. After the police officer testified and the government rested, the trial court asked appellant, who was appearing *pro se*,[1] whether he had any witnesses he would like to call, and appellant responded that he was unable to contact his witnesses and secure their presence. The trial court responded "Very well," and then, according to the trial transcript, the court clerk immediately instructed appellant to "please stand where you are and raise your right hand." The transcript does not reflect that appellant had made any indication that he intended to testify.[2] Appel-

---

* Judge Schwelb was an Associate Judge of this court at the time of argument. His status changed to Senior Judge on June 24, 2006.

1. On the day of trial, the trial court appointed an attorney-advisor, John Spaulding, Esquire, to assist appellant, but the attorney did not participate in this exchange between the trial court and appellant.

2. The trial transcript reflects that after the government's witness stepped down, the government rested. Then, Mr. Spaulding moved for a judgment of acquittal. After that, the transcript reads:

 The Court: Very well. At this time the court is gonna deny your motion. Does your client have any wit—do you have any witnesses you would like to call, Mr. Pitt–Bey?

Appellant: I'm unable to contact the—Mr. Butler–EL is no longer in town, I'm not able to contact him, and the other driver is, is out of touch.

The Court: Very well.

The Clerk: Sir, would you please stand where you are and raise your right hand?

 Thereupon, Eric Pitt–Bey, the defendant, having been called as a witness on his behalf, and after having been first duly sworn by the deputy clerk, was examined and testified as follows:

The Clerk: Thank you. You may be seated, sir.

Appellant: Thank you.

Mr. Spaulding: Would you please state your full name?

Appellant: My name is Eric Milton Pitt–Bey.

lant was sworn in, and responding to questions (some by Mr. Spaulding but most by the trial judge himself), appellant admitted that he, indeed, stepped off the curb after a police officer told him not to. Appellant explained that he had been driving in a separate car behind Mr. Butler–EL on a goodwill mission to a homeless shelter, when Mr. Butler–EL's car was unexpectedly stopped by the police. Appellant got out of his car, and after initially staying on the curb as requested by the officer, decided to approach Mr. Butler–El's vehicle because he was concerned about the way he was being treated by the officers after being pulled over, in what appellant considered was "a very rough manner" for someone who "was totally in compliance." He wanted to observe what was happening and prevent the situation from "getting out of control," because he knew that Mr. Butler–EL had a "temper." In his opening statement, appellant had said he thought the entire matter had been a "misunderstanding," adding that the charge against Mr. Butler–EL had been dropped the following day.

The trial judge found appellant guilty of failing to obey a police officer "based upon the testimony of the defendant himself after resolving all issues of credibility. Because when Officer Korson testified, this court was not convinced that the defendant failed to obey his lawful order." Appellant, who had no prior offenses, was ordered to pay a fine of $100, but execution of payment of the fine was suspended subject to six months of unsupervised probation. Appellant was also required to pay $50 to the fund for compensation of victims of violent crime.

## II.

■ We consider first—and reject—appellant's claim that he is immune from prosecution in the Superior Court of the District of Columbia. Appellant argues that, even though he is a United States citizen (having been born in Brooklyn, New York), as an "Associate Minister" of the Council of The Nation of Moorish Americans ("TNOMA"), he should be accorded diplomatic immunity pursuant to federal law. Such diplomatic immunity, however is granted to members of "a foreign diplomatic mission," who are statutorily defined to include "(A) ... members of the diplomatic staff or who, pursuant to law, are granted equivalent privileges and immunities, (B) members of the administrative and technical staff of a mission, and (C) members of the service staff of a mission...." 22 U.S.C. § 254a (1)(A)-(C) (2004). Appellant has not produced any evidence demonstrating he is diplomatic staff or a member of a qualified mission. In fact, U.S. citizens may not normally be part of a diplomatic mission of another country, unless the United States expressly consents to such an arrangement. *See* Vienna Convention on Diplomatic Relations art. 8, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95. Appellant has presented only an "Official Identification Card" of "The Nation of Moorish–Americans Inc.," which identifies him as Executive Vice-President.[3] According to appellant's testi-

---

Mr. Spaulding: Your address please?

Appellant: [gives address]

Mr. Spaulding: Drawing your attention back to this incident that we've been talking about, you heard the officer testify that you did step on the curb the first time he asked you to do that?

Appellant: That is correct, sir.

Appellant continued to give his version of the events in response to questioning by Mr. Spaulding and the trial court.

3. The reverse side of the card states:

The bearer of this card is a Citizen of the United States of America covered by the Moroccan/American Friendship Treaty of

mony at trial, TNOMA is an organization that was "incorporated as a sovereign body politic in the District of Columbia" in 1995. Appellant, therefore, is not a diplomatic staff representative of a sovereign nation, recognized by the United States Department of State, whose diplomatic staff are accorded various degrees of immunity from prosecution. *See* 22 U.S.C. § 4302(a)(3) (2001);[4] *see also Slater v. Biehl*, 793 A.2d 1268, 1272 (D.C.2002) (discussing courts' general acceptance of the views of the State Department as to recognition of diplomatic status); *Carrera v. Carrera*, 84 U.S.App. D.C. 333, 334, 174 F.2d 496, 497 (1949).

Appellant also argues immunity from prosecution under the Moroccan–American Treaty of Peace and Friendship, ratified by President Andrew Jackson on January 28, 1837.[5] Treaty of Peace and Friendship, U.S.-Morocco, Oct. 1, 1836, 1836 U.S.T. LEXIS 10. As its title indicates, the treaty is one of "Peace and Friendship" between the sovereign states of Morocco and the United States, and it provides that subjects or citizens of each country will be held safe by the other, as well as a protocol for any confrontations that might arise between the two countries while at sea, during trade or battle. *See id.* It does not contain any language suggesting that the United States, or any state or territory therein, does not have jurisdiction over a person violating the law within its jurisdiction. *See id.* Therefore, this treaty has no bearing on this case.

### III.

Appellant's argument that his Fifth Amendment privilege against self-incrimination was violated raises substantive concerns that, if supported by the record, would require reversal of his conviction and remand for a new trial.[6] Every defendant in a criminal trial "has the absolute right not to testify." *Littlejohn v. United States*, 705 A.2d 1077, 1083 (D.C. 1997). The Fifth Amendment to the United States Constitution states, in relevant part, that "No person shall ... be com-

---

1408, which was ratified in 1787 and recognized as protecting the Moors as subjects of Morocco (again ratified 1987); and the Constitution of United States of American [sic] which states "1. All Debts contracted and Engagements entered into, before the Adoption of this Constitution, shall be as valid against the United States under this Constitution, as under the Confederation. 2. This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."
*See generally* The Nation of Moorish Americans, http://www.thenationofmoorishamericans.org/bey.htm (last visited Feb. 11, 2008).

4. *See generally* U.S. Department of State, Bureau of Intelligence and Research, Indepen-

dent States in the World, http://www.state.gov/s/inr/rls/4250.htm (last visited Feb. 11, 2008).

5. The first such treaty was signed by John Adams and Thomas Jefferson, as "Ministers Plenipotentiary," in 1787.

6. Although appellant made this argument in his reply brief, see note 8, *infra*, and, at the court's insistence, addressed it at oral argument, appellant's main contention at trial and on appeal has been that this case is about "more than just [himself] and a fairly minor infraction;" to appellant, it is about obtaining the recognition due to Moors in the United States under treaties and the United States Constitution, concerning the proper venue and jurisdiction (in federal court) to consider the government's claim against him. Although appellant argued that the treaty issue was paramount, he did not waive the Fifth Amendment argument.

pelled in any criminal case to be a witness against himself...." U.S. Const. amend. V. Thus, the right not to testify in one own's defense, originating in this Fifth Amendment privilege against self-incrimination, is of fundamental constitutional significance. *See, e.g., Rock v. Arkansas,* 483 U.S. 44, 53, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (stating that the Fifth Amendment's privilege against self-incrimination "is fulfilled only when an accused is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' ... The choice of whether to testify in one's own defense ... is an exercise of the constitutional privilege.") (quoting *Harris v. New York,* 401 U.S. 222, 230, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971)) (Brennan, J., dissenting) (quoting *Malloy v. Hogan,* 378 U.S. 1, 7, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (noting that "the American system of criminal prosecution is accusatorial, not inquisitorial, and that the Fifth Amendment privilege is its essential mainstay")); *Boyd v. United States,* 586 A.2d 670, 672 (D.C.1991) (describing the decision whether to testify as one of great constitutional magnitude).

In addition to the decision's implication of a fundamental constitutional right, a defendant's choice whether to testify is also one of great strategic import. We have stated that the decision "can be the single most important factor in a criminal case." *Boyd,* 586 A.2d at 673. Indeed, in this case, appellant's testimony sealed his fate: the trial court stated in its oral findings that after the government's case, it "was not convinced that the defendant failed to obey [the police officer's] lawful order," but that appellant's testimony resulted in his admission that "he indeed failed to obey" the officer's order, and therefore was guilty as charged.[7] Thus, there is no doubt that appellant's testimony was not only self-incriminating, but also led to his conviction.

 Appellant's claim on appeal is that when the trial court clerk instructed him to raise his right hand in order to be sworn in, he understood the trial court to be ordering him to testify,[8] and that he did

7. The officer who testified for the government agreed that appellant at no point resisted arrest, and that he had perceived no difficulty encountered by the other officer who had stopped Mr. Butler–EL's car. The officer explained that he ordered appellant to stay on the curb and not approach Mr. Butler–EL's stopped vehicle because of safety concerns inherent in all traffic stops, not this one in particular.

8. Appellant did not make this claim until his reply brief. The record indicates, however, that he did not receive the trial transcripts until September 2005, after his initial brief was due and filed with the court in November 2004. The record contains a request for the production of the transcripts made in April 2005, in which appellant states that he originally requested the transcripts in August 2004, when he filed his notice of appeal, but never had received the transcripts. The government was copied on this request and therefore was on notice that appellant might

supplement his argument with excerpts from the transcripts. Additionally, when the parties were notified on December 27, 2005, that oral argument in this case was to take place on January 3, 2006, both parties were directed to "be prepared to address the 5th Amendment issue raised in appellant's November 2005 reply brief." The government subsequently filed a D.C.App. R. 28(k) letter calling the court's attention to cases in support of its thoroughly prepared oral argument on this matter. Given that appellant was hampered in presenting the argument due to the delay in the production of the transcript, and that the government was able to prepare for and present a response to appellant's arguments on this issue during oral argument, we are satisfied that any prejudice arising from the late introduction of this argument has been cured. Thus, we will rule on its merits. *See Gathy v. United States,* 754 A.2d 912, 916 (D.C.2000) (agreeing to hear an argument raised for the first time in a reply brief where the government had the opportunity to refute the argu-

not realize he had a choice in the matter. In considering whether the trial proceeding improperly compelled appellant's testimony and, ultimately, self-incrimination, we are faced with a situation where the defendant represented himself, but with the assistance of an attorney-advisor appointed by the court on the day of trial.[9] *Compare Smith v. United States,* 837 A.2d 87, 99 (D.C.2003) (finding no plain error where two defendants, who testified at trial, were not specifically addressed by the court regarding their right not to testify, but their counsel informed the court that they would testify, and the court had informed a third, non-testifying co-defendant of the right to testify or not to testify and asked the co-defendant whether he had conferred with his lawyer about it—all in the presence of the two defendants and their counsel—and the testifying defendants' attorneys did not request a similar inquiry concerning their clients' decision to testify), *with Wood v. United States,* 75 U.S.App. D.C. 274, 286–87, 128 F.2d 265, 277–78 (1942) (noting that unrepresented defendant, in particular, should be thoroughly apprised of right not to testify by trial court, so as to "assure fairness to the accused and foreclose the possibility that

he might act in ignorance"); *see Killpatrick v. Superior Court,* 153 Cal.App.2d 146, 314 P.2d 164, 166 (1957) ("The privilege [against self-incrimination] cannot be made truly effective unless the defendant in a criminal case who is not represented by counsel is advised by the court of the existence of the privilege whenever such advice appears to be necessary."). The situation before us does not fit neatly into either the category of represented or unrepresented defendants because even though the attorney-advisor at times conducted parts of the proceeding on appellant's behalf, appellant maintained at trial that he was "still representing [him]self." [10] Self-representation is a right that the Supreme Court has said "is necessarily implied by the structure" of the Sixth Amendment. *Faretta v. California,* 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). If a defendant knowingly chooses to represent himself, the court may not impose counsel. *See id.* at 835–36, 95 S.Ct. 2525.

At the outset of trial, in response to the judge's question whether he had counsel, appellant told the judge that he did not have an attorney and that he was proceeding *pro se.* When the judge asked

ment and was not substantially prejudiced by the appellant's failure to raise it in his opening brief); *see generally Akassy v. William Penn Apts., L.P.,* 891 A.2d 291, 304 n. 11 (D.C.2006) (noting the rule that arguments raised for the first time in a reply brief will not be considered (citing D.C.App. R. 28(c); *Joyner v. Jonathan Woodner Co.,* 479 A.2d 308, 312 n. 5 (D.C.1984))).

9. On appeal, appellant has represented himself, without the assistance of counsel.

10. Appellant's attorney-advisor participated in tandem, though not necessarily in collaboration, with appellant throughout the trial. He and appellant both gave opening statements, after which appellant announced "I will now take over at this point for myself." The attorney-advisor voiced objections during the prosecution's questioning of its witness;

appellant and the attorney-advisor conducted the cross-examination in nearly equal parts. The attorney-advisor posed questions to appellant during his testimony on direct examination, with additional questioning by the trial court during direct and cross-examination. Appellant and the attorney-advisor both made closing arguments. In each instance, appellant spoke first, and then the attorney-advisor followed-up, usually addressing legal arguments that appellant, who was not a lawyer, had failed to present. There is no indication in the record that the two discussed the content of the other's presentations, other than possibly during the brief two-minute recess before the trial began, after which the attorney-advisor informed the court that they had "discussed this matter."

whether appellant would like an attorney to assist, appellant said "No." The judge further offered an attorney "to act in an advisory capacity ... if you wish." Although appellant stated that, "I don't see any point in that. I'll represent [my]self," the trial judge immediately appointed John Spaulding, Esquire, as attorney-advisor. The record reveals that the court then allowed only a "two-minute recess" during which the attorney-advisor and appellant could have discussed the case before opening statements, but there is no indication that they discussed appellant's privilege against self-incrimination and his right not to testify. Under these circumstances, this is not a case in which we can assume—in the absence of evidence to the contrary—that in due course of a normal legal representation of a criminal defendant, counsel would be expected to advise the client of the right not to testify. *See Boyd,* 586 A.2d at 678.

█ The government points out that, even if the attorney-advisor did not advise appellant, he had been informed six months prior to trial, at a preliminary hearing, that if his case were to go to trial, the court would hear testimony from the government's witnesses and "then I'd hear from you if you wanted to provide testimony, but I couldn't compel you to testify, but you certainly could." The comment was made by a magistrate judge, not the judge who conducted the trial, and was made in the context of the court's need to postpone the trial because of other matters and to explain the government's offer that, in lieu of trial, appellant could simply "post and forfeit," *i.e.,* pay $100 and "the case just goes away." [11] We are not persuaded that, standing alone, this passing reference to appellant's right not to testify, made six months before trial by a different judge,[12] could be viewed as an effective safeguard of the Fifth Amendment privilege, particularly in the context of what appellant claims was an express directive by the court to take the stand at the trial. At neither time was appellant advised that the right to testify or not is personal to the defendant and constitutionally protected, nor was he informed that the fact-finder could not make negative inferences from his decision not to take the stand. Neither the written record nor the transcript contains any statement by the defendant, the attorney-advisor, or the court, that appellant made an informed and voluntary decision to waive his privilege against self-incrimination, and to testify in his own defense. On this record, we are not at all confident that appellant was aware of his rights under the Fifth Amendment.[13]

Viewed as a whole, the record is also not clear on whether appellant was compelled

11. The magistrate judge explained that appellant would not have a conviction, but would continue to have an arrest record. According to the magistrate judge, the offer "is a real advantage that [appellant] will probably never have an opportunity to get again." Appellant did not opt to "post and forfeit," and expressed that he "want[ed] to go forward with it."

12. Magistrate Judge Milton C. Lee informed appellant that he could choose to have his case tried by an associate judge, and appellant exercised that choice. The bench trial was presided by Superior Court Judge Erik P. Christian.

13. In making this determination, we need not decide whether the trial court is required to conduct a colloquy in every case in which there is a testifying defendant to ensure that he or she is knowingly, intelligently, and voluntarily waiving his or her privilege against self-incrimination. *See generally Boyd,* 586 A.2d at 678–79 (describing the recommended colloquy to make a similar determination about a defendant's decision not to testify); *Smith,* 837 A.2d at 99 (declining to hold whether a *Boyd*-type inquiry is necessary for a testifying defendant). It is sufficient to say that a judge has a heightened responsibility when the testifying defendant is not repre-

to testify by the court. On the one hand, the transcript reveals that immediately before appellant was sworn in as a witness, there was only the barest exchange between the trial judge, the court clerk, and appellant. See note 2, *supra*. Appellant had not, as far as the record indicates, been currently advised of the potential perils of testifying and of his absolute right not to do so; nor had appellant said that he wanted to testify. Read literally, the transcript reveals a stark directive by the trial court clerk that appellant take the stand, immediately after appellant said that the two witnesses he had hoped to call were not available. On this record, we cannot conclude, therefore, that the trial court's actions did not compel appellant to testify and thereby incriminate himself, in violation of his Fifth Amendment privilege.

We recognize, however, that the trial transcript does not always capture nonverbal indications and gestures of the participants, upon which trial judges might rely in conducting trial proceedings. On appeal, on the other hand, we are limited to the cold record, with its inherent limitations, and neither party has suggested that the transcript is an incomplete or inaccurate recordation of the circumstances that led up to appellant's taking the stand. There are, nonetheless, other factors that suggest that if appellant felt compelled to testify it was not as a result of the court's

doing, or because he was uninformed of his options. First, and most important, is the situation in which appellant found himself at that juncture in the trial. The government's case had been presented, and the judge had just denied appellant's motion for judgment of acquittal, which had been presented—albeit without any argument— by the attorney-advisor. Although denial of the motion did not necessarily imply that the judge, as fact-finder, would believe the government's witness and find appellant guilty (the trial judge, as fact-finder, later indicated that he would not have found appellant guilty based solely on the testimony of the police officer), denial of the motion for acquittal certainly could have influenced appellant's decision to present evidence to counter the officer's testimony and support his defense. But the two witnesses that appellant had hoped to call (Mr. Butler–EL and the "other driver") were not available, as he told the court. The trial judge's sole response was to say, "Very well." The transcript then immediately shows the clerk telling appellant, "Sir, would you please stand where you are and raise your right hand?" This exchange could be read as a court directive, through the court clerk, that appellant was required to testify.[14] This is appellant's position, and it could be supported by the trial judge's own questioning of appellant during direct and cross-exami-

sented by counsel. *See Wood*, 75 U.S.App. D.C. at 286–87, 128 F.2d at 277–78.

**14.** The transcript also states that "Thereupon, Eric Pitt–Bey, the defendant, *having been called as a witness on his behalf*, and after having been first duly sworn by the deputy clerk, was examined and testified." (Emphasis added). The notation that appellant testified "on his behalf" could be an indication that testifying was appellant's choice. But we are uncertain whether this notation in the transcript can be read to have such significance or is simply a protocol followed by the court reporter when describing the testimony

of a defendant. On the other hand, if we assume that the clerk simply ordered appellant to take the stand without having been informed that appellant wished to do so, it seems to us somewhat improbable that neither the judge nor counsel would have said something about such an unusual event. Given the attorney-advisor's late entry into the case, and his limited participation, however, it is possible that he could have thought that appellant had already voiced his desire to testify. In short, we cannot confidently ascertain what occurred from the record that we have.

nation. But the exchange, when viewed in the context of the evidentiary straits in which appellant found himself, could also reflect the fact that appellant had decided, on his own, that he had no choice but to testify if he was to offer any evidence to counter the government's case. This kind of "compulsion," generated by the desire, or need, to present evidence to support a defense, is not what the Fifth Amendment forbids.

The government also pointed out at oral argument that appellant is not "shy" and was "bursting" to present his version of the facts, alluding, for example, to certain facts in his opening statement which only he could have presented as evidence. From the testimony at trial and oral argument, the court is convinced that appellant is an educated person able to persuasively articulate his position to the court. But as at trial, appellant's principal focus throughout has been on his contention that TNOMA ministers enjoy protected diplomatic status and can be sued, if at all, in federal court. This is what he sought to convey to the police officers who detained Mr. Butler–EL and to the trial court when he argued that the District of Columbia courts lack jurisdiction. Even though this court requested oral argument *sua sponte* on the Fifth Amendment issue, appellant made it clear at oral argument that his principal interest remained the issue of the diplomatic status of TNOMA ministers. It was the desire to present this essentially *legal* argument that animated most of appellant's presentation to the trial court, not his desire to counter the police officer's factual recitation of events, with which appellant essentially agreed (to his detriment) with respect to his own conduct.

Appellant's persistent focus on the U.S.-Morocco treaty and related constitutional arguments casts doubt on our ability to say that appellant made a knowing choice to testify as to facts—rather than present legal arguments *pro se*—particularly when it is contrary to what appears on the face of the record.[15]

In light of these uncertainties, we remand the case for further proceedings to supplement the record with respect to the circumstances surrounding appellant's taking the stand, including whether he had previously expressed that he wished to testify and whether he was advised by the attorney-advisor of the right not to testify. We leave to the trial judge to determine, in the first instance, whether an evidentiary hearing is required to make these determinations. If it is determined that appellant was either directed to testify, without his having previously expressed his intention to do so, or took the stand (whether or not directed by the court clerk) without knowledge of his Fifth Amendment right not to testify, appellant's conviction must be reversed. If, on the other hand, appellant took the stand as his own choice, with awareness that he had a right not to do so, the verdict should stand.

For the foregoing reasons, although we reject appellant's challenge to the Superior Court's jurisdiction over him, we remand the case to the trial court for further proceedings to supplement the record concerning the circumstances that led to appellant's self-incriminating testimony.

*So ordered.*

---

**15.** The transcript shows that appellant did not "burst" with his testimony of the facts, nor did he testify primarily in response to the attorney-advisor's attempt at questioning him on direct. Rather, the judge intervened at the outset of the attorney-advisor's questioning, prompting appellant to "Just tell him what happened." Appellant then did as the judge requested.