*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CV-679

WENDY PAOLA DESTEFANO, *et al.*, APPELLANTS,

V.

CHILDREN'S NATIONAL MEDICAL CENTER, *et al.*, APPELLEES,

No. 13-CV-693

CHILDREN'S NATIONAL MEDICAL CENTER, APPELLANT,

V.

WENDY PAOLA DESTEFANO, *et al.*, APPELLEES,

No. 13-CV-694

COLONIAL PARKING, INC., APPELLANT,

V.

WENDY PAOLA DESTEFANO, *et al.*, APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(CAB-1935-10)

(Hon. Anita M. Josey-Herring, Trial Judge)
(Hon. Todd E. Edelman, Motions Judge)

(Argued January 27, 2015                    Decided July 23, 2015)

*Dawn V. Martin* for appellants/cross-appellees.

*Christopher E. Hassell*, with whom *Andrew Butz*, *Dawn Singleton*, and *Megan Kinsey-Smith* were on the brief, for appellee/cross-appellant Colonial Parking, Inc.

*Adam W. Smith*, with whom *Gary W. Brown* was on the brief, for appellee/cross-appellant Children's National Medical Center.

Before FISHER and MCLEESE, *Associate Judges*, and REID, *Senior Judge*.

FISHER, *Associate Judge*:  Wendy Paola Destefano and Enrique Ibanez sued Children's National Medical Center and Colonial Parking, Inc., for injuries caused when their son fell down an air shaft in a parking garage.[1]  A jury awarded plaintiffs a total of $1,586,000, and all parties appealed.  We reverse the trial court's decision granting summary judgment to the defendants on Ms. Destefano's claim of negligent infliction of emotional distress, but otherwise affirm.

## I.     Background

Children's National Medical Center ("CNMC") operates a hospital which specializes in medical care for children; its main building includes an underground

---

[1]  The parents sued on behalf of their minor children, G.I. and V.I. Ms. Destefano also sued on her own behalf.

parking garage. Colonial Parking, Inc., a private parking company, operates and manages that garage.

On March 11, 2009, Ms. Destefano brought her six-year-old son, G.I., to CNMC to see a neurologist. Her four-year-old daughter, V.I., accompanied them. G.I. had regular appointments at CNMC because he had a lifelong seizure disorder stemming from a brain hemorrhage that occurred when he was thirteen days old.

Ms. Destefano parked her car in a designated parking space near the wall of the garage. When the family returned after G.I.'s appointment, Ms. Destefano asked her children to back up in the space between the car and the wall so she could open the car door. When the children did so, G.I. fell backwards through a vent in the wall that opened into a twenty-five-foot air shaft. The metal cover for the hole was leaning against the wall nearby.

V.I. had been holding G.I.'s hand, and she screamed her brother's name when he fell. When Ms. Destefano bent over and reached into the hole for G.I., the momentum caused her to drop her keys down the air shaft. She moved back so she would not fall down the shaft herself. G.I. was rescued from the bottom of the air shaft and taken to the emergency room. He suffered numerous injuries from the

fall, including fractured wrists, a split scalp, various cuts and bruises, post-traumatic stress disorder, and post-concussive syndrome.

On March 25, 2010, plaintiffs sued CNMC and Colonial for negligence. After a month-long trial, a jury awarded G.I. $1,560,000 and V.I. $26,000, finding both defendants jointly and severally liable.

## II.  No Damages for Permanent Post-Concussive Syndrome

The trial court instructed the jurors that they could award damages for "any emotional distress that G.I. may suffer in the future, except you may not award future damages due to permanent Post-Concussive Syndrome"; they also could award damages for "any inconvenience G.I. may experience in the future, except you may not award future damages due to permanent Post-Concussive Syndrome." Plaintiffs contend that it was error for the judge to preclude the jury from awarding G.I. future damages for *permanent* post-concussive syndrome. They argue that the following instruction, based on Standardized Civil Jury Instruction for the District of Columbia No. 13-2, should have been given instead:

> G.I. has offered evidence that the Defendants' negligence
> caused him to suffer personal injury and that the effects

> of that injury still exist today, more than four years after the incident. Although no physician or other expert testified about how long the effects of the injury might last, you may still conclude from the facts and circumstances of the case and from the nature and duration of the injury, that G.I. has suffered a permanent injury and award damages accordingly.

"A 'party is entitled to a jury instruction upon [a] theory of the case if there is sufficient evidence to support it.'" *Washington Inv. Partners of Del., LLC v. Sec. House, K.S.C.C.*, 28 A.3d 566, 577 (D.C. 2011) (quoting *George Washington Univ. v. Waas*, 648 A.2d 178, 183 (D.C. 1994)). "In deciding whether a proposed instruction on a party's theory of the case was properly denied, we review the record in the light most favorable to that party." *Id.* However, "[a] trial court has broad discretion in fashioning appropriate jury instructions," and we will not reverse "if the court's charge, 'considered as a whole, fairly and accurately states the applicable law.'" *Id.* (quoting *Psychiatric Inst. of Washington v. Allen*, 509 A.2d 619, 625 (D.C. 1986)).

Plaintiffs rest their argument on the opinion of Dr. Brian Woodruff, a pediatric neurologist, who testified that G.I.'s post-concussive syndrome was caused by the concussion he suffered during his fall and not by his preexisting condition. When asked how long he thought G.I's post-concussive syndrome

would last, Dr. Woodruff said it was "still ongoing." He also testified that "the majority of people" have their post-concussive syndrome resolve in "a couple of weeks to a couple months," but it is "really hard to predict" how long it might last.

Defendants emphasize the testimony of other experts. Dr. Nathan Dean, the doctor who treated G.I. immediately after he fell in the parking garage, testified that a single concussion is a self-limiting injury, or one that does not get worse, and "after a period of weeks, the symptoms go away and you are fine." Dr. David Franz, a pediatric neurologist, likewise testified that a concussion does not get worse and resolves itself over time barring further trauma. Finally, Dr. William Gaillard, another pediatric neurologist, testified that when he last saw G.I. on April 20, 2009, he believed that G.I. could experience post-concussive syndrome for up to a year, but that permanent injury from his concussion would be "remote" or "extraordinarily rare." At the time of trial, a year had already elapsed.

The trial court did not err in precluding the jury from considering damages for permanent post-concussive syndrome. This court has previously recognized that "when the bad effects of an injury have continued for years, laymen may reasonably infer permanence even in the absence of medical testimony, *if there is no contrary testimony that the injuries are temporary.*" *Estate of Underwood v.*

*Nat'l Credit Union Admin.*, 665 A.2d 621, 643 (D.C. 1995) (quoting *Int'l Sec. Corp. of Va. v. McQueen*, 497 A.2d 1076, 1081 (D.C. 1985)) (emphasis added) (internal quotation marks omitted). In this case, Dr. Gaillard testified that G.I.'s post-concussive syndrome was temporary. To receive the instruction they requested, plaintiffs were therefore required to offer expert testimony that G.I.'s post-concussive syndrome was permanent.

Dr. Woodruff's opinion was not sufficient; the jury could only speculate that the condition would be permanent because he could not predict how long it would last. *See Davis v. Abbuhl*, 461 A.2d 473, 476 n.5 (D.C. 1983) (stating that additional expert medical testimony would be required for an instruction on permanent-injury damages where a physician testified that the plaintiff required medical treatment but "could not say how long such treatment would be needed"). Thus, the trial court properly instructed the jury that G.I. could not be awarded damages for *permanent* post-concussive syndrome.[2]

_____

[2] The trial court properly allowed the jury to consider awarding G.I. damages for past, present, and future injury from post-concussive syndrome because Dr. Woodruff testified that the condition was ongoing. Only an award of *permanent* damages was precluded.

### III.   Punitive Damages

Plaintiffs also contend that the trial court should have submitted the issue of punitive damages to the jury.  Before punitive damages may be assessed against a corporation for the acts of its employees, a plaintiff must show "by clear-and-convincing evidence that the [employee's] tortious acts were 'accompanied by conduct and a state of mind evincing malice or its equivalent.'"  *District of Columbia v. Bamidele*, 103 A.3d 516, 522 (D.C. 2014) (quoting *District of Columbia v. Jackson*, 810 A.2d 388, 396 (D.C. 2002)).  In addition, the plaintiff must show that the corporation, through its officers, directors, or managing agents, "participated in the doing of the wrongful act or authorized or subsequently ratified the offending conduct with full knowledge of the facts."  *Snow v. Capitol Terrace, Inc.*, 602 A.2d 121, 127 (D.C. 1992).  We view the evidence in the light most favorable to the plaintiffs' cause, asking only whether there was evidence from which a jury reasonably could find the required elements.  *Bamidele*, 103 A.3d at 522.[3]

---

[3] Plaintiffs contend that Judge Josey-Herring wrongly precluded the jury from considering punitive damages because such damages "carry a stigma." That was not the basis of her decision, however.  The trial judge did say that stigma from the punitive damages issue could prejudice the jurors while they were determining whether defendants were liable at all.  To prevent such prejudice, she severed the jury's consideration of punitive damages from its other deliberations.

(continued…)

To establish "malice or its equivalent," the plaintiff must prove two things: (1) that the employee "acted with evil motive, actual malice, deliberate violence or oppression, or with intent to injure, or in willful disregard for the rights of the plaintiff," and (2) that the employee's conduct "was outrageous, grossly fraudulent, or reckless toward the safety of the plaintiff." *Id.* (quoting *Jackson*, 810 A.2d at 396) (internal quotation marks omitted). In this case, the only possible basis for finding "malice or its equivalent" is willful or reckless disregard.

Plaintiffs concede that there is no evidence that a CNMC employee knew about the open vent or intentionally left it uncovered. Instead, they contend that CNMC's officers recklessly disregarded their safety. An individual evinces willful or reckless disregard when he or she "knows, or has reason to know of facts which

---

(…continued)

That decision was well within her discretion. *See Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 717 (D.C. 2013) (trial court "has broad discretion in managing the conduct of a trial"). But only the *issue* of punitive damages was initially withheld from the jury; at trial, plaintiffs presented all the evidence that they believed justified an award of such damages. If the jury found liability, and the proof warranted, there would be a supplemental portion of the trial which included evidence of the defendants' net worth, arguments of counsel, additional instructions, and further deliberations. In a lengthy ruling from the bench while the jury was deliberating, Judge Josey-Herring found that plaintiffs had not presented enough evidence to justify an award of punitive damages. Her decision was not based on any stigma that could arise from such an award.

create a high degree of risk of harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk," or "has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 493-94 (2008) (quoting Restatement (Second) of Torts § 500 cmt. a (1965)) (internal quotation marks and alterations omitted). Recklessness "must be something more than negligent. . . . It must involve an easily perceptible danger of death or substantial physical harm, and the probability that it will so result must be substantially greater than is required for ordinary negligence." Restatement (Second) of Torts § 500 cmt. a.

Plaintiffs contend that CNMC's officers were guilty of reckless disregard because they did not review Colonial's paperwork to determine whether the parking company was properly conducting inspections of the garage. While that evidence may show that the hospital was negligently inattentive to Colonial's work, it does not demonstrate that CNMC acted with reckless indifference because there was no evidence that the hospital knew or had reason to know about the open vent or similar hazardous conditions. In short, there was no lawful basis for allowing the jury to award punitive damages against CNMC.

There was, by contrast, evidence that a Colonial employee knew about the open vent. According to testimony at trial, a parking attendant reported the problem to a Colonial employee who dismissed his concerns. However, even if that indifference amounted to reckless disregard by that unknown Colonial employee, plaintiffs offered no evidence identifying him by name or position in the company. Thus, the record does not show that a Colonial officer, director, or managing agent authorized, participated in, or subsequently ratified this failure to remedy the hazard posed by the open vent.

Plaintiffs instead point to inspection checklists from Colonial which appear to have been signed by a parking attendant named Belete Belete. The checklists purportedly showed that, in the two weeks before G.I. fell, Belete had conducted safety inspections of that area of the garage. Belete, however, testified that he had not performed those inspections or signed those checklists. He also said that, after G.I.'s accident, two of his supervisors asked him to falsely certify that he had conducted safety inspections of the garage.[4] Plaintiffs contend that the checklists

---

[4] This court has not yet formulated a test to determine what level of responsibility an employee must have to be considered an "officer," "director," or "managing agent" of a corporation. According to the Supreme Court, such a determination "requires a fact-intensive inquiry" that depends on "the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished." *Kolstad v. Am.*

(continued…)

were forgeries designed to hide Colonial's misconduct. Relying on *Daka, Inc. v. McCrae*, 839 A.2d 682 (D.C. 2003), they argue that such a cover up or "sham investigation" is a proper predicate for awarding punitive damages.

Under the circumstances of this case, we disagree. The purpose of imposing punitive damages is to punish unlawful conduct and deter its repetition. *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 725 (D.C. 2003). If a defendant does not recklessly disregard a known danger or intentionally commit a tort, punitive damages cannot deter repetitions of such conduct. *See Burke v. Maassen*, 904 F.2d 178, 182 (3d Cir. 1990) ("It is impossible to deter a person from taking risky action if he is not conscious of the risk." (internal quotation marks omitted)). Thus, punitive damages cannot be imposed unless "the defendant's tortious acts were '*accompanied by* . . . a state of mind evincing malice or its equivalent.'" *Bamidele*, 103 A.3d at 522 (emphasis added) (quoting *Jackson*, 810 A.2d at 396).

In *McCrae*, the plaintiff sued his employer for, among other things, retaliating against him after he reported that his supervisor had sexually harassed

---

(…continued)
*Dental Ass'n*, 527 U.S. 526, 543 (1999) (internal quotation mark omitted). We assume, for the purposes of this appeal, that Belete's supervisors qualified as managing agents of Colonial.

him. 839 A.2d at 686. The *McCrae* court concluded that the defendant's actions merited punitive damages because the company conducted a sham investigation into the plaintiff's complaints of harassment (and instead of looking into the misconduct of his supervisor, accused the plaintiff of sexual harassment), demoted him, and eventually terminated his employment in retaliation. *Id.* at 696. The sham investigation was an integral part of the retaliation, and therefore reflected on the defendant's state of mind at the time the tortious act occurred.

In this case, Colonial's attempt to cover up its failure to inspect by forging checklists, while reprehensible, was not the tortious act that caused harm to plaintiffs.[5] "A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 423 (2003); *see also id.* at 422 ("A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages."). Colonial's conduct *after* G.I.'s fall does not show that Colonial's employees acted with malice or reckless disregard in

---

[5] Had Colonial attempted to use the forged documents to mislead the court or the jury, the trial judge had ample authority under the court's equitable powers to sanction that conduct. *See In re M.L.P.*, 936 A.2d 316, 322 (D.C. 2007) ("[T]he court . . . has inherent authority to impose sanctions upon a showing of bad faith."); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991).

failing to cover the vent *before* the accident. *See Burke*, 904 F.2d at 183 (defendant's "attempts at covering up his wrongdoing are not sufficient evidence from which a jury could conclude that [he] consciously appreciated the risk of his actions prior to" his tortious conduct). The jury could not have lawfully assessed punitive damages against Colonial.[6]

### IV. Ms. Destefano's Claim of Emotional Distress

Ms. Destefano sued both defendants for negligent infliction of emotional distress resulting from G.I.'s accident. Ordinarily, "[w]e adhere to the traditional rule that there can be no recovery for mental distress and its consequences resulting exclusively from observation of harm or danger to a third person." *Williams v. Baker*, 572 A.2d 1062, 1069 (D.C. 1990) (en banc). In *Williams*, however, we

---

[6] Plaintiffs argue that they presented sufficient evidence to support the conclusion that Colonial acted in reckless disregard of plaintiffs' safety because it had a corporate culture of recklessness. They point to the testimony of Colonial's CEO, who said that the company canceled a yearly training of all Colonial employees in favor of leaving the training of new hires to their managers. However, Judge Josey-Herring found that an expert was needed to opine on whether the company was reckless or negligent in its training and supervision of employees. While plaintiffs contest her decision, they do so in an undeveloped, conclusory manner. We agree that the appropriate level of training and supervision of parking garage attendants is not within the ken of the average juror. *See Young v. District of Columbia*, 752 A.2d 138, 146 (D.C. 2000) (affirming grant of summary judgment on plaintiff's negligent training claim for failure to designate an expert on training of police officers).

modified that doctrine, "adopt[ing] the zone of danger rule which allows recovery for mental distress as long as the plaintiff was in the zone of physical danger and as a result feared for his or her own safety because of defendant's negligence." *Id.* at 1073. If so, "the plaintiff may also recover . . . damages for mental distress caused by fear for the safety of a member of the plaintiff's immediate family who was endangered by the negligent act." *Id.* Judge Edelman granted summary judgment to defendants on this claim, concluding that plaintiffs had not shown that Ms. Destefano was in the zone of physical danger.

## A. Recovery by Plaintiffs Who Are Not Within the Zone of Danger

Ms. Destefano relies upon our decision in *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789 (D.C. 2011) (en banc), pointing out that, in some circumstances, a plaintiff who was not in the zone of physical danger may nevertheless recover for negligent infliction of emotional distress. We held that a plaintiff

> may recover for negligent infliction of emotional distress
> if the plaintiff can show that (1) the defendant has a
> relationship with the plaintiff, or has undertaken an
> obligation to the plaintiff, of a nature that necessarily
> implicates the plaintiff's emotional well-being, (2) there
> is an especially likely risk that the defendant's negligence

would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff.

*Id.* at 810-11.  Ms. Destefano contends that she had a special relationship with CNMC because the hospital was treating her son, G.I.

We reject Ms. Destefano's argument, even assuming, for the sake of this appeal, that she and CNMC had a special relationship arising from the hospital's doctor-patient relationship with G.I.  As *Hedgepeth* makes clear, "the scope of the defendant's undertaking determines the scope of its duty."  *Id.* at 794 (internal quotation marks omitted).  The hospital would have had (at most) a duty to avoid causing Ms. Destefano emotional distress in matters relating to the medical care of her child.  Any "special relationship," and CNMC's corresponding duty, would not extend to the maintenance, care, or operation of the parking garage.

CNMC does have a duty to act reasonably in maintaining a safe parking garage.  However, the hospital's relationship with patrons using its parking garage is not one that "necessarily implicates" the emotional well-being of those customers, and therefore does not give rise to a duty to avoid the negligent infliction of emotional distress in the way the garage is run.  *See id.* at 810, 812

n.39.[7] Thus, Ms. Destefano's emotional-distress claim could survive only if she was in the zone of physical danger caused by defendants' negligence.

### B. Was Ms. Destefano in the Zone of Danger?

The rectangular hole in the wall through which G.I. fell was approximately three feet wide by two feet tall, and it began between a foot and a foot-and-a-half off the floor. The top of the hole was slightly more than three feet from the floor, a little above Ms. Destefano's waist level. In his order granting summary judgment, Judge Edelman reasoned that the hole was dangerous to G.I. because of his size— the small boy accidentally fell backwards through it. He then determined that the risk of unintentionally falling through the hole in that manner "simply did not exist for an adult"; Ms. Destefano "was not exposed to risk of *accidentally* falling into the air shaft and was therefore not in the zone of danger when . . . G[.I.] fell."

---

[7] Ms. Destefano also contends that she had a "special relationship" with Colonial, but the company's duty to Ms. Destefano only involved its operation and maintenance of the parking garage. As we have explained, that is not the sort of relationship that "necessarily implicates" her emotional well-being. *See Hedgepeth*, 22 A.3d at 812 n.39 (not all relationships that impose duties give rise to the duty to avoid negligent infliction of emotional distress).

Our current case law supports that conclusion. To be in the zone of danger, a plaintiff must be "physically endangered by the defendant's negligent activity." *Johnson v. District of Columbia*, 728 A.2d 70, 77 (D.C. 1999). The open vent was hazardous because G.I. fell into it by accident while backing up. Ms. Destefano could not have accidentally fallen in the way G.I. did because the top of the vent was too low in relation to her body. Thus, she was not initially in the zone of danger because she was not physically endangered by the hole in the wall.

Plaintiffs contend, however, that Ms. Destefano was *later* at risk of falling into the hole accidentally when she reached in to rescue G.I. As evidence, they primarily rely on statements in Ms. Destefano's affidavit. Plaintiffs argue that Judge Edelman unfairly excluded that evidence because he mistakenly thought it was part of a "sham affidavit."[8]

Under the sham affidavit doctrine, "courts will disregard an offsetting affidavit that is submitted to withstand a motion for summary judgment when the affidavit contradicts prior deposition testimony without adequate explanation and creates only a sham issue of material fact." *Hinch v. Lucy Webb Hayes Nat'l*

---

[8] Plaintiffs also contend that Judge Edelman erred in finding that Ms. Destefano could not physically fit into the open vent. However, he did not make that finding or base his reasoning on it.

*Training Sch. for Deaconesses & Missionaries Conducting Sibley Mem'l Hosp.*, 814 A.2d 926, 929 (D.C. 2003). However, an affidavit can only be considered a sham if it "clearly contradict[s] *prior* sworn testimony." *Id.* at 930 (emphasis added). Ms. Destefano's affidavit was prepared and signed before her deposition testimony (and in fact was used as an exhibit at her deposition); it therefore could not be excluded from consideration under the sham-affidavit rule.

Judge Edelman found that "[p]laintiffs presented no evidence that [Ms.] Destefano was ever actually in danger of falling into the air shaft, aside from the affidavit which directly contradicted her deposition testimony." As a result, he reasoned that Ms. Destefano "was not in the zone of danger . . . when she attempted the rescue, and therefore would be unable to recover for negligent infliction of emotional distress."

Ms. Destefano's affidavit should have been considered. According to that affidavit, Ms. Destefano heard V.I. scream that her brother was gone. She turned around and heard G.I. screaming in the hole, so she "immediately bent down and reached into the hole trying to get him." She "had no idea that the hole dropped two stories down," and "thought that there must be a floor on the other side of it." As she "lunged forward into the hole," she dropped her keys and "almost fell into

the hole [her]self." Ms. Destefano also "heard G[.I.] land somewhere in the hole and it sounded like a thump," and "heard G[.I.] crying and calling for" her. In her deposition testimony, she confirmed that she accidentally dropped her keys down the air shaft when putting her head in to look down the hole. She also said that V.I. "was kind of at the same time pulling me back as she, as if she would be afraid of me falling as well."

Ms. Destefano stated, in her affidavit, that the experience "was the most horrible feeling I had ever felt, because I could not reach him or help him." She also said, "I am petite, so . . . I could easily fit into the hole . . . ." The statements in the affidavit provided evidence that Ms. Destefano was at risk of accidentally falling into the hole when she attempted to rescue G.I. Judge Edelman erred when he ignored the affidavit and concluded to the contrary.[9]

---

[9] In her affidavit, Ms. Destefano said she almost accidentally fell into the hole when looking for her son. Judge Edelman believed that statement contradicted her deposition testimony, where she said that "I wanted to go through that hole, but I couldn't." However, a finder of fact could infer that she said she could not enter the hole because she would fall if she did, not because she could not fit. Because Judge Edelman was deciding a summary judgment motion, he was obliged to view the evidence in the light most favorable to Ms. Destefano. *See Furline v. Morrison*, 953 A.2d 344, 351 (D.C. 2008).

Still, this court has never held that a plaintiff can bring himself or herself into the zone of danger *after* another person has been injured. Ms. Destefano argues that we should adopt the so-called "rescue doctrine" and allow her to recover for her emotional distress because her exposure to the risk of falling while reaching for her son brought her into the zone of danger.[10] That doctrine "allows an individual injured while attempting to rescue another from peril to recover in tort from the person whose negligence caused the situation." *Lee v. Luigi, Inc.*, 696 A.2d 1371, 1374 n.2 (D.C. 1997). Although this court has closely analyzed the "professional rescuer" exception to that doctrine, *see Melton v. Crane Rental Co.*, 742 A.2d 875, 876 (D.C. 1999) (collecting cases), we have never adopted the doctrine itself, *see Gillespie v. Washington*, 395 A.2d 18, 20 n.* (D.C. 1978) (discussing the doctrine but stating "[w]e do not by our holding here mean to imply an adoption of the rescue doctrine in this jurisdiction").

---

[10] Plaintiffs first urged this court to adopt the "rescue doctrine" in their reply brief. Normally, we would not consider an issue first raised at that late juncture. *See Stockard v. Moss*, 706 A.2d 561, 566 (D.C. 1997). However, we have sometimes, at our discretion, chosen to consider such arguments. *See, e.g.*, *Pitt-Bey v. District of Columbia*, 942 A.2d 1132, 1137 n.8 (D.C. 2008) (agreeing to hear an argument raised for the first time in a reply brief where the government had the opportunity to refute the argument and was not substantially prejudiced by the appellant's failure to raise it in his opening brief). Defendants argued against the adoption of the "rescue doctrine" before the trial court, did not move to strike the portion of plaintiffs' reply brief discussing the matter, and had the opportunity to address plaintiffs' contentions at oral argument. We will therefore consider the issue, taking into account the arguments that defendants made to the trial court.

The vast majority of jurisdictions recognize, in some form, that "it is commendable to save life," and that therefore "a person who endeavors to avert the consequences of the negligence of another person, by an act which is dangerous but not reckless, is not precluded from recovering damages for injury suffered as a consequence of having interposed." *Scott v. John H. Hampshire, Inc.*, 227 A.2d 751, 753 (Md. 1967), *superseded on other grounds by rule*, Md. R. 5-701 to -702, *as recognized by Ragland v. State*, 870 A.2d 609 (Md. 2005); *see also* H.D.W., Annotation, *Liability for death of, or injury to, one seeking to rescue another*, 158 A.L.R. 189 (2015) (citing cases from forty-three states discussing aspects of the rescue doctrine). We join them in adopting the rescue doctrine.[11]

This does not necessarily help Ms. Destefano, however. The traditional form of the rescue doctrine has rarely been used to allow recovery by a plaintiff who has suffered only emotional distress but not physical harm. *See Michaud v. Great N. Nekoosa Corp.*, 715 A.2d 955, 960 (Me. 1998) (stating, without citation,

---

[11] We realize that the rescue doctrine "addresses a mélange of issues that arise when a rescuer is injured in attempting to assist another . . . [which] include duty, scope of liability, superseding cause, contributory negligence, and assumption of risk." Restatement (Third) of Torts: Phys. & Emot. Harm § 32 cmt. b (2010). We do not here attempt to outline the full contours of the doctrine. Nor do we attempt to disclaim our previous decisions on the "professional rescuer" exception to the doctrine. *See Melton*, 742 A.2d at 876-79.

that "[t]he rescue doctrine has never been applied in any jurisdiction in a case involving purely psychic injuries"). Despite the certainty expressed in this quotation from *Michaud*, courts disagree on that point. *Compare id.* (disallowing recovery because doing so "would expand liability out of proportion with culpability"), *and Migliori v. Airborne Freight Corp.*, 690 N.E.2d 413, 416-18 (Mass. 1998) (refusing to allow rescuers to recover for emotional distress if they do not also fall within the jurisdiction's rules for "bystander liability," which require the plaintiff to be a close family member who contemporaneously perceives the traumatic event), *with Colombini v. Westchester Cty. Healthcare Corp.*, 808 N.Y.S.2d 705, 709 (App. Div. 2005) (father could bring claim for infliction of emotional distress because he entered the zone of danger when rushing into a hospital room to help his son), *and Daigle v. Phillips Petroleum Co.*, 893 S.W.2d 121, 122-23 (Tex. App. 1995) (holding that plaintiff who suffered post-traumatic stress disorder, but no physical injury, as a result of attempted rescue could recover).

In *Williams*, we adopted the zone-of-danger rule, allowing plaintiffs to recover damages for emotional distress because we "recognize[d] that 'a near miss may be as frightening as a direct hit.'" *Hedgepeth*, 22 A.3d at 811 (quoting *Williams*, 572 A.2d at 1067). A rescuer can suffer the same type of fright after

encountering a dangerous situation during a rescue attempt. Limiting recovery when the rescuer otherwise meets the requirements of the zone-of-danger test would be arbitrary. We therefore hold that plaintiffs who enter the zone of danger in a rescue attempt may recover damages for mental distress, as long as they feared for their own safety, because of the defendant's negligence, while in the zone of danger. Such plaintiffs can also recover damages for mental distress caused by fear for the safety of an immediate family member who was endangered by the negligent act. *Cf. Williams*, 572 A.2d at 1073.

Ms. Destefano's affidavit provided evidence that she believed G.I. was in imminent peril, that she tried to rescue him by entering into the open vent, and that she almost fell into the air shaft accidentally. While she did not explicitly say that she feared for her own safety during her rescue attempt, a jury could reasonably infer that she was afraid for herself because she almost fell down the hole. *See Folks v. District of Columbia*, 93 A.3d 681, 683 (D.C. 2014) (on summary judgment motion, reasonable inferences are drawn in the non-moving party's favor). Ms. Destefano also said that she only realized that G.I. had fallen a considerable distance when she reached into the hole, and that she was emotionally distraught because she could not help her son. As a result, she provided evidence

at the summary judgment stage sufficient to establish a plausible claim for negligent infliction of emotional distress.

## V.    V.I.'s Emotional-Distress Claim

A plaintiff who was not physically injured can recover on a claim for negligent infliction of emotional distress only if he or she "was in the zone of physical danger and was caused by defendant's negligence to fear for his or her own safety . . . ." *Williams*, 572 A.2d at 1067. After the jury awarded V.I. $26,000 for negligent infliction of emotional distress, defendants filed a motion for judgment as a matter of law, contending that this claim should not have been submitted to the jury. They concede that V.I. was in the zone of danger. (She was standing next to G.I. and holding his hand when he fell into the vent, and she could have accidentally fallen into the hole herself.) They asserted, rather, that there was no evidence that V.I. feared for her own safety. Defendants appeal Judge Josey-Herring's decision to deny their motion.

V.I. did not testify at trial. Nevertheless, viewing the trial record in the light most favorable to her, *Furline v. Morrison*, 953 A.2d 344, 351 (D.C. 2008), we conclude that there was sufficient evidence for a reasonable jury to conclude that

she feared for her own safety.  Dr. Adair Parr, a child psychiatrist who examined

V.I. after her brother's accident, testified as follows:

> Q.  [D]o you see where [an email] makes a reference to V.I. saying "I died?"  I meaning V.I.'s talking about herself?
>
> A.  Yes.
>
> Q.  And did you factor that into your diagnosis of Post-Traumatic Stress Disorder for V.I.?
>
> A.  Yes.
>
> Q.  And did that indicate to you whether she had any fears for her – herself and her own life as well as for her brother?
>
> A.  Yes.  I mean, it indicated that she was worried about death and dying.

Debra Jenkins, plaintiff's expert on post-traumatic stress disorder, likewise

testified that V.I. had dreams of herself, her brother, and her mother swimming,

drowning, and dying.

Defendants contend that this testimony only proves that V.I. feared for her

brother's safety.  However, the jurors were instructed that they could only award

damages to V.I. if "the defendant's negligence caused her to fear for her own

safety." A jury could reasonably infer, from V.I's comments about dying, that she feared for her own safety at the time of her brother's fall. Her claim was properly submitted to the jury.[12]

## VI.    Colonial's Appeal

After the trial, Colonial filed a motion for judgment as a matter of law, contending, among other things, (1) that it had no legal duty to keep the parking garage safe and (2) that plaintiffs failed to establish the proper standard of care. We review *de novo* whether the evidence was sufficient to go to the jury, *Townsend v. Donaldson*, 933 A.2d 282, 297 (D.C. 2007), and will reverse the denial of a motion for judgment as a matter of law if "'no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party,'" *Presley v. Commercial Moving & Rigging, Inc.*, 25 A.3d 873, 897 (D.C. 2011) (quoting *Lyons v. Barrazotto*, 667 A.2d 314, 320 (D.C. 1995)).

---

[12] Plaintiffs request a retrial of the amount of V.I.'s damages, contending that the trial court unfairly limited their time to present evidence relevant to her emotional distress. We cannot, however, discern whether the trial court abused its discretion in setting time limits for trial because plaintiffs do not explain why such limits were unreasonable. *See Pietrangelo*, 68 A.3d at 717 (trial court has broad discretion in managing trials).

## A.     Did Colonial Have a Duty to Plaintiffs?

Colonial first contends that it had no legal duty to plaintiffs regarding the safety of the parking garage.  The company, citing *Presley*, argues that in situations where a plaintiff is suing for negligence arising from the defendant's undertaking of a service to a third party, the defendant's liability is limited by the scope of the service he or she undertook.  *See Presley*, 25 A.3d at 889.

That argument does not help Colonial because the facts of this case show that it did not merely undertake a limited set of duties with respect to the parking garage.   Its contract with CNMC requires Colonial to "operate the [p]arking [g]arage"; "[r]ecruit, engage, hire, supervise and discharge all employees and persons needed in order to operate said [p]arking [g]arage"; "[d]irect courteously, and efficiently, all traffic into and out of the [p]arking [g]arage"; and take all "actions and steps as may be necessary to manage, service and operate the [p]arking [g]arage properly and efficiently."

The contract also obligated Colonial to patrol the garage and provide general maintenance, including "general cleaning of the parking garage," "treatment of oil

spills," "sweeping and . . . emptying of all trash containers," and "mechanical sweeping of all parking levels." Testimony at trial established that Colonial employees were supposed to fulfill those obligations by patrolling the garage three times a day. They were trained to look for certain hazardous conditions on a checklist that they filled out while patrolling the garage. The checklist included inspecting different "surfaces" in the garage for damage; checking for leaks in the pipes, ceilings, or walls; and making sure drain covers were properly in place.

In contrast, the agreement obligated CNMC to maintain "major structural items" in the parking garage, defined as "the air handling systems, the maintenance of green space, sewer systems, sump pumps, traps and drains, HVAC systems, plumbing, all concrete surfaces and other major structural elements . . . , sprinkler and fire systems and electrical and lighting fixtures . . . ." Even then, evidence at trial showed that CNMC relied on Colonial to report structural problems for repair.

To carry out its duties, Colonial hired and contracted with workers to direct the flow of traffic coming into and out of the garage. Those workers were assigned their duties by Colonial employees. The company printed tickets for customers when they entered the garage and collected parking fees from them when they left.

Though Colonial was hired by CNMC to manage the parking garage, it was clearly in control of those "business premises."

Colonial's contract with CNMC (and the related evidence at trial describing the way Colonial and CNMC carried out their respective duties and responsibilities) shows that Colonial had primary control over the parking garage. Courts in this jurisdiction have long recognized that businesses in control of parking areas have a possessory interest in the premises that gives rise to a duty of reasonable care to those who are present. *See, e.g.*, *Becker v. Colonial Parking, Inc.*, 133 U.S. App. D.C. 213, 216-17, 409 F.2d 1130, 1133-34 (1969) ("A parking lot operator, like other possessors of business premises, though not an insurer of the safety of his customers, does owe them a duty of reasonable care." (internal footnotes omitted)); *Daisey v. Colonial Parking, Inc.*, 118 U.S. App. D.C. 31, 32-34, 331 F.2d 777, 778-80 (1963) (pedestrian could bring claim for negligence against parking lot operator when she tripped over a chain that was "part of a parking area under defendants' control"). Plaintiffs were in the parking garage for business purposes. Colonial therefore owed them a duty of care as a possessor of the premises.

## B.     Expert Testimony

Colonial also contends that its motion for judgment as a matter of law should have been granted because plaintiffs provided no expert testimony on the standard of care.  We review that ruling for abuse of discretion.  *District of Columbia v. Tulin*, 994 A.2d 788, 795 (D.C. 2010).  "Where negligent conduct is alleged in a context which is within the realm of common knowledge and everyday experience, the plaintiff is not required to adduce expert testimony either to establish the applicable standard of care or to prove that the defendant failed to adhere to it." *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 200 (D.C. 1991).  "Expert testimony is required, however, where the subject presented is 'so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson.'" *Id.* (quoting *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988)).

Under the circumstances of this case, it was not beyond the ken of the average layperson to determine whether Colonial deviated from the standard of care.  According to testimony at trial, Colonial had notice of the open vent because a contract employee reported the problem to a Colonial employee who dismissed the contractor's concerns.  It does not take special knowledge to know that a large, uncovered vent in the wall of a parking garage could be a hazard, or that taking

reasonable steps, such as posting a warning or replacing the vent cover, could ameliorate the danger. Indeed, one of CNMC's witnesses testified that even if she did not know where the uncovered vent led, she would still consider it a type of safety hazard that was a "[v]ery serious immediate threat." The trial court therefore did not abuse its discretion in determining that expert testimony was not required to establish Colonial's deviation from the standard of care in this case.

## VII. Other Issues

Plaintiffs contend that the trial court abused its discretion when it granted them only $51,683.84 of the $247,553.91 in costs they requested. We are not persuaded. The court properly denied some of the requests due to inadequate documentation, and "[g]iven the court's . . . detailed explanation of why it awarded some costs but not others, [plaintiffs] have not borne the considerable burden of demonstrating that discretion was abused in these areas." *Cormier v. District of Columbia Water & Sewer Auth.*, 84 A.3d 492, 501-02 (D.C. 2013).

Plaintiffs also contend that the trial court's order on costs, which was issued on June 24, 2013, improperly changed the date post-judgment interest began accruing on their various awards. Contrary to their suggestion, post-judgment

interest on the jury's award began on the date of that judgment. The June 24 ruling on costs only purported to give defendants until July 31, 2013, to pay the costs award before interest began accruing on that award.

Plaintiffs and CNMC also ask this court to decide several issues to guide the trial court in conducting a retrial in this case. However, we are only remanding Ms. Destefano's claim, which never went to trial. Without a proper record, we cannot predict whether these issues will arise again. If they do, we leave them for the trial court to decide in the first instance.

## VIII. Conclusion

We vacate the order of summary judgment entered in favor of defendants on Ms. Destefano's claim for negligent infliction of emotional distress, and remand for further proceedings consistent with this opinion. The judgment of the Superior Court is otherwise affirmed.